DELWIN G. CHASE AND GAIL J. CHASE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7562-86.     Filed April 24, 1989.

*Neil F. Horton, James G. Roberts,* for the petitioners.

*Rebecca T. Hill, Susan J. Adler,* and *Bryce A. Kranzthor,* for the respondent.

FAY, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the 1980 taxable year in the amount of $1,074,874. After concessions, the following issues are presented for decision:

(1) Did petitioners satisfy section 1031[1] on the disposition of the John Muir Apartments?

(2) Are petitioners entitled to a short-term capital loss of $783,762, under section 731(a)(2), with respect to the receipt of $929,582 in complete liquidation of a limited partnership interest held by both petitioners?

We hold that, applying the substance over form doctrine, the John Muir Investors, a partnership, rather than petitioners disposed of the John Muir Apartments. Further, we hold that petitioners, as partners of John Muir Investors, are not entitled to the benefits of section 1031 nonrecognition. Further, we hold that petitioners' entitlement to installment sales treatment under section 453 is an untimely raised issue. Finally, we hold that petitioner Gail Chase is entitled to recognize a short-term capital loss in 1980 in connection with her complete liquidation of her entire interest in John Muir Apartments.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulated facts and attached exhibits are incorporated herein by this reference.

Petitioners Delwin G. Chase (Mr. Chase) and Gail J. Chase (Mrs. Chase), resided in Alamo, California, at the time their petition herein was filed. Petitioners filed a joint Federal income tax return for the year at issue.

### *Disposition of the John Muir Apartments*

On January 26, 1978, Mr. Chase formed John Muir Investors (JMI), a California limited partnership. JMI was

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

formed for the purpose of purchasing, operating and holding the John Muir Apartments, an apartment building located in San Francisco, California (hereinafter referred to as the Apartments), which were purchased by JMI on March 31, 1978, for $19,041,024. Subsequently, Triton Financial Corp. (Triton) was added as a general partner of JMI. Triton was a corporation in which petitioner held a substantial interest. Mr. Chase and Triton were general partners who had the exclusive right to manage JMI.

Pursuant to JMI's limited partnership agreement, once limited partners made contributions to JMI, they were prohibited from receiving distributions of property, other than cash, in liquidation of their capital contributions to JMI. A section of the JMI limited partnership agreement entitled "status of limited partners" provided as follows:

> No limited partner shall have the right to withdraw or reduce his invested capital except as a result of the termination of the partnership or as otherwise provided by law. No limited partner shall have the right to bring an action for partition against the partnership. No limited partner shall have the right to demand or receive property other than cash in return for his contribution, and no limited partner shall have priority over any other limited partner either as to the return of his invested capital or as to profit, losses or distribution.

After JMI held the Apartments for approximately 1 year, there developed a high level of speculative interest in San Francisco in purchasing apartment buildings for conversion to condominium units for sale to individuals. This speculative interest caused the value of real estate capable of being converted to condominium units, such as the Apartments, to appreciate. By mid 1979, JMI was attempting to find a buyer for the Apartments.

On January 20, 1980, JMI accepted an offer (first offer) to purchase the Apartments from an unrelated individual for $28,421,000. Subsequent to JMI's acceptance of the first offer, but prior to the scheduled closing date, petitioners attempted to structure the sale of the Apartments in such a way that they would not have to recognize any taxable gain. To accomplish this, Mr. Chase caused JMI to distribute to himself and his wife a deed to an undivided 46.3527 percent interest in the Apartments in liquidation of petitioners' 46.3527 percent limited partnership interest in JMI.

Petitioners attempted to structure the subsequent disposition of the Apartments pursuant to the first offer so that, as to them, such disposition would be treated for Federal tax purposes as a nontaxable nonsimultaneous exchange of real property for other real property.

On February 5, 1980, the first offer expired due to the failure of the buyer to deposit funds into escrow by such date as required by the escrow agreement. However, there was a second offer for the purchase of the Apartments on March 21, 1980, at which time an agent of RWT Enterprises, Inc. (RWT), wrote a letter of intent to Triton, one of JMI's two managing general partners, to purchase the Apartments for $26,500,000 (second offer). This letter further stated that any broker's commissions would be paid by Triton. This letter did not indicate that RWT believed, or had been informed, that petitioners, individually, had any ownership interest in the Apartments.

In connection with the second offer, on March 26, 1980, an officer of Triton wrote a letter on behalf of JMI, in Triton's role as a managing general partner of JMI, to a brokerage company. This letter stated that JMI agreed to pay a real estate brokerage commission of $250,000 as a result of the sale to RWT and that this commission was the total commission due. Triton did not mention petitioners' undivided ownership interest in the Apartments, or of any duty by petitioners to pay a pro rata portion of such commission.

In preparing to close the sale, an escrow agreement was executed. Under the heading "seller," the escrow agreement was signed, on behalf of JMI, by Mr. Chase. The escrow agreement was not signed by petitioners on behalf of themselves as individual owners of the Apartments.

On June 12, 1980, when Mr. Chase was certain that the sale to RWT was going to close, he recorded the deed from JMI, executed in January 1980, for petitioners' undivided interest in the Apartments.

Petitioners, as with the first offer, attempted to structure the Apartments' disposition so that it would not be taxable to them. To this end, on June 13, 1980, petitioners entered into a Real Property Exchange Trust Agreement (exchange agreement) with RWT and Dudley Ellis (Mr. Ellis). Mr. Ellis

was a former employee of Mr. Chase who agreed to serve as trustee of a trust (the Ellis Trust), created under the exchange agreement. The exchange agreement was executed in anticipation of the sale of the Apartments to RWT, and provided that RWT, as purchaser of the Apartments, would transfer to the Ellis Trust petitioners' share of the proceeds. Pursuant to the exchange agreement, Mr. Ellis, in his capacity as trustee of the Ellis Trust, agreed to transfer to petitioners "like-kind real property" which Mr. Ellis was to purchase with such proceeds. Specifically, the exchange agreement provided that petitioners would locate and negotiate the terms for the purchase of properties to be "exchanged." Petitioners then instructed Marilyn Lamonte, the escrow officer handling the sale, to pay 46.3527 percent of the "net proceeds' from the sale to Mr. Ellis as trustee under the exchange agreement.

On July 7, 1980, the John Muir Apartments were sold to Traweek Investment Fund No. 10, Ltd. (Traweek), an entity related to, and substituted as buyer by, RWT. The net proceeds of $9,210,876 received from the sale to Traweek were allocated by Lamonte between the Ellis Trust and JMI. The actual payments out of escrow were a check for $3,799,653 to Ellis in his capacity as trustee under the Ellis Trust, and a check for $4,811,223 paid directly to JMI.

Petitioners' instructions to Lamonte, to the effect that Ellis, as trustee, was to be the recipient of 46.3527 percent of "net proceeds" from the sale, were not followed. Rather, the portion of the proceeds distributed to Ellis in trust for petitioners represented an allocation of a distributive share of total net proceeds to petitioners in their capacity as limited partners of JMI in accordance with the terms of the JMI limited partnership agreement and not as a straight allocation of 46.3527 percent of "net proceeds."

From January 1980, until the date of the sale was closed, the expenses of operating the Apartments were paid with funds that were in JMI's operating bank account. Petitioners did not pay, with their own money, any of the expenses from January 1980, when they received a deed to the Apartments through July 7, 1980, the date of sale. Petitioners also did not receive any of the rental income earned during this period, such rent continued to be paid to JMI.

Petitioners' relationship with respect to the Apartments, after they were deeded an undivided interest in such, was in all respects unchanged in relation to their relationship to the Apartments as limited partners of JMI.

On June 30, 1981, Ellis, as trustee of the Ellis Trust, assigned to Creston Corp. (Creston), as successor trustee of the Ellis Trust, petitioners' share of the proceeds from the sale. Creston was, at the time of such assignment, a corporation wholly owned by Ellis.

By July 23, 1982, Triton, as general partner of entities controlled by petitioner, completed the acquisition of the following three properties which were later acquired from Creston by petitioners: (1) The Snug Harbor Apartments in Dallas, Texas (the Snug Harbor property); (2) a ground lease to commercial real property in Orange County, California (the Irvine property); and, (3) certain commercial real estate in Santa Ana, California (the Woodbridge property).

Creston, as trustee under the Ellis Trust, acquired, and immediately transferred to petitioners, the Snug Harbor property on or about October 27, 1982. Petitioners held the Snug Harbor property for 7 months. Creston acquired and then transferred to petitioners, the Irvine property on October 29, 1982. Petitioners, in turn, disposed of the Irvine property on the same date. On October 29, 1982, Creston acquired, and then transferred the Woodbridge property to petitioners, who disposed of the property on the same date. In addition to the above properties, Creston, as trustee under the Ellis Trust, also purchased for petitioners three other properties located in the State of Kentucky.

### Liquidation of the Lockwood Interest

On March 5, 1980, petitioners purchased a 2.92-percent limited partnership interest in JMI from Albert and Hazel Lockwood for $230,000 and a 8.78-percent limited partnership interest from Todd and Karen Sue Lockwood for $690,000 (hereinafter referred to collectively as the Lockwood interest). The Lockwood interest was a limited partnership interest in addition to the 46.3527-percent interest previously acquired.

On July 9, 1980, 2 days after the disposition of the Apartments, petitioners received $929,582 in complete liqui-

dation of their 11.72-percent Lockwood interest. Petitioners reported a short-term capital loss of $783,762 on their 1980 Federal income tax return as a result of this distribution. Petitioners computed their adjusted basis and loss as follows:

| | |
|---|---:|
| Cost of Lockwood interest | $920,000 |
| Distributive share of long-term capital gain reported from the sale of the John Muir Apartments | 850,189 |
| Distributive share of operating loss reported | (59,845) |
| Adjusted basis | 1,710,344 |
| Amount realized | 926,582 |
| Less adjusted basis | 1,710,344 |
| Claimed loss | (783,762) |

The $929,582 cash distribution from the liquidation of this 11.72-percent interest liquidated petitioners' entire *limited* partnership interest in JMI held as of this date. Petitioner, however, continued thereafter to hold an interest in JMI as a *general* partner. After this liquidation of the 11.72-percent interest, JMI continued operating as a partnership for the purpose of investing in other real property.

On December 31, 1980, petitioners acquired a 1.31-percent limited partnership interest in JMI from Anthony and Carole Cline.

OPINION

The first issue is whether petitioners met the requirements of section 1031. Section 1031(a) provides that no gain or loss is recognized if property held for productive use in a trade or business or for investment (excluding certain types of property not involved herein) is exchanged solely for property of like-kind. Since the distinction between "trade or business" and "investment" in section 1031(a) is immaterial for our purposes, for convenience, we will use the term "held for investment."Based on a number of theories, respondent contends that petitioners are not entitled to nonrecognition under section 1031(a) or, in the alternative, that petitioners must recognize gain under section 1031(b) to the extent that certain of the property ultimately received by petitioners was not held for investment.

Respondent contends that section 1031(a) is inapplicable because the disposition of the Apartments was, in substance, a sale by JMI, and not an exchange by petitioners of like-kind property. Petitioners contend that we must respect the form in which they structured the disposition of the Apartments, and that such form satisfied the requirements of section 1031(a).

To qualify for nonrecognition, a taxpayer must satisfy each of the specific requirements as well as the underlying purpose of section 1031(a). *Bolker v. Commissioner,* 760 F.2d 1039, 1044 (9th Cir. 1985), affg. 81 T.C. 782 (1983). We must determine whether the "exchange" requirement of that section was satisfied. Respondent argues that the substance over form doctrine is applicable to impute the disposition of the Apartments entirely to JMI and concludes that, in substance, petitioners did not "exchange" any part of the Apartments.

The substance over form doctrine applies where the form chosen by the parties is a fiction that fails to reflect the economic realities of the transaction. *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945); *United States v. Cumberland Public Service Co.,* 338 U.S. 451 (1950). In determining substance, we must look beyond the "superficial formalities of a transaction to determine the proper tax treatment." *Blueberry Land Co. v. Commissioner,* 361 F.2d 93, 101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964). "Transactions, which did not vary, control, or change the flow of economic benefits, are dismissed from consideration." *Higgins v. Smith,* 308 U.S. 473, 476 (1940). We hold that the substance over form doctrine applies and that, in substance, JMI disposed of the Apartments.

Although the general partners of JMI caused JMI to prepare a deed conveying an undivided 46.3527-percent interest in the Apartments to petitioners, at no time did petitioners act as owners except in their roles as partners of JMI. Petitioners were deeded an undivided interest at the time of the first offer because it appeared that a sale was imminent. When this sale failed to close, however, petitioners' deed remained unrecorded until shortly before the disposition in question. There is no indication that any party to the sale believed that anyone other than JMI held

title at the time of RWT's offer to purchase. Further, there is no evidence of negotiations by petitioners on behalf of themselves concerning the terms for the disposition of the Apartments. Also, petitioners never paid any of the operating costs of the Apartments or their share of the brokerage commission. Further, petitioners did not receive, or have credited to them, any of the Apartment's rental income.

Equally important, in apportioning the net sale proceeds, all parties ignored petitioners' purported interest as direct owners. Rather, petitioners received only their distributive share of JMI's net proceeds as limited partners. In addition, the JMI limited partnership agreement provided that no limited partner could demand and receive property *other than cash* from the partnership. Further, there is no evidence that petitioners were otherwise authorized by the other limited partners to receive a share of the Apartments as a partnership distribution or that the other limited partners were even aware that such a distribution had occurred. We can only conclude that petitioners' failure to respect the form in which they cast this transaction by failing to receive their share of proceeds as direct owners was caused by petitioners' realization that they were not direct owners and could not be so by virtue of the partnership agreement.

Petitioners final argument regarding the substance issue is that JMI's general partners acted as petitioners' agents in negotiating the disposition of the John Muir Apartments to Traweek. This, petitioners argue, explains why they did not appear, individually, as parties in most of the documents to this transaction. We find petitioners' argument, in this regard, both self-serving and unsupported by the record.

Having determined that, in substance, JMI disposed of the Apartments, we must determine whether petitioners are entitled to "exchange" treatment under section 1031(a), which treatment would flow through JMI to all partners in accordance with their distributive share of partnership gain. Sec. 702(a). Petitioners are entitled to nonrecognition of gain under section 1031(a), as a partner of JMI, if JMI has satisfied the requirements of section 1031(a) in disposing of the Apartments.

Section 1031(a) requires that like-kind property be both given up and received in the "exchange." Here, it is clear that JMI transferred investment property but did not receive like-kind property in "exchange." This is because JMI never held the properties that were ultimately received by petitioners as part of the purported "exchange." Accordingly, JMI never "exchanged" like-kind property.

Having concluded that JMI sold the entire interest in the Apartments, and that JMI did not act as petitioner's agent with respect to an undivided interest in such apartment, we hold that petitioners failed to "exchange" like-kind property within the meaning of section 1031(a). Accordingly, petitioners are not entitled to the benefits of that section.[2]

Petitioners argue, alternatively, for the first time on brief, that if section 1031(a) is inapplicable, they now be allowed to elect installment sale treatment under section 453. Petitioners cite *Bayley v. Commissioner,* 35 T.C. 288 (1960), wherein we permitted a taxpayer to elect, in an amended petition, the installment method under section 453, where the issue of nonrecognition under section 1034 was decided adversely to the taxpayer. Petitioners' argument fails for two reasons. First, petitioners did not amend their pleadings or raise such issue at trial, but only raised such issue on brief. See *Seligman v. Commissioner,* 84 T.C. 191 (1985) affd. 796 F.2d 116 (5th Cir. 1986); *Markwardt v. Commissioner,* 64 T.C. 989 (1975). Second, since we find that JMI disposed of the Apartments, the election under section 453 can only be made by the partnership. See sec. 703(b); *Rothenberg v. Commissioner,* 48 T.C. 369 (1967). Accordingly, we hold petitioners are not entitled to elect installment sale treatment under section 453.

The final issue is whether petitioners are entitled to claim a short-term capital loss of $783,762 under section 731(a)(2) in connection with their receipt of $929,582 in complete liquidation of their Lockwood limited partnership interest on July 9, 1980. This issue is raised because petitioner held a general partnership interest in JMI throughout 1980 and petitioners subsequently reacquired a limited partnership in JMI on December 31, 1980. The general rule contained in section 731(a)(2) is that a partner may not recognize a loss

---

[2]We do not address respondent's alternative arguments, *as those arguments are moot.*

from a partnership distribution. Section 731(a)(2) provides an exception to the general rule of nonrecognition, however, if certain requirements are met. First, the distribution must be "in liquidation of a partner's interest in a partnership." Second, no property other than money, unrealized receivables (as defined in section 751(c)), or inventory (as defined in section 751(d)(2)) must be received in the liquidating distribution. Third, a loss must be realized. See sec. 731(a)(2).

With respect to the first requirement, both parties refer to section 761(d). That section defines, for purposes of subchapter K, the term "liquidation of a partner's interest" as "the termination of a partner's *entire* interest in a partnership by means of a distribution, or a series of distributions, to the partner by the partnership." (Emphasis added.) Respondent argues that under section 761(d), in order to terminate one's "entire interest" in a partnership, one must terminate both his general and limited partnership interests. Petitioners argue that section 761(d) only requires the termination of either the entirety of one's limited partnership interest or one's general partnership interest. Petitioners further argue that the retention of one's general partnership interest does not prevent, under section 731(a)(2), the recognition of a loss upon the termination of one's entire limited partnership interest.

We find, however, that petitioners' argument ignores the plain meaning of the statute which is unambiguous on its face. Section 761(d) provides that the term "liquidation of a partner's interest" means the termination of a partner's entire interest by means of a distribution, or a series of distributions, to the partner by the partnership. When petitioners liquidated their Lockwood interest, Mr. Chase still retained an interest in JMI as a general partner and, therefore, he did not liquidate his "entire interest" in JMI. As to Mrs. Chase, she no longer was a partner in JMI after the distribution in liquidation of the Lockwood interest. Although, as noted by respondent, she became a limited partner in JMI on December 31, 1980, she no longer had any interest in JMI, as of July 9, 1980.

Respondent argues that no loss can be realized because petitioners received nonqualifying property (46.3527-percent

interest in the Apartments), as opposed to money, unrealized receivables, or inventory, as part of a series of liquidating distributions, and that petitioners are thus disqualified from realizing a loss. It is unnecessary to reach this argument since we previously held herein that the distribution to petitioners of an interest in the Apartment was, for Federal tax purposes, illusory. Accordingly, we hold that petitioner Gail Chase is entitled to a short term capital loss.

To reflect the foregoing.

*Decision will be entered under Rule 155.*