116 T.C. No. 29


UNITED STATES TAX COURT


D. G. SMALLEY AND NELL R. SMALLEY, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2767-98.                    Filed June 14, 2001.


        In 1994, H entered into a deferred exchange
whereby he relinquished 2-year timber cutting rights on
his land and in return received in 1995 fee simple
interests in three parcels of real estate.  The
transferee's obligation to transfer replacement
property to H was secured by cash held in a qualified
escrow account as defined in sec. 1.1031(k)-1(g)(3),
Income Tax Regs.

        Held:  At the beginning of the exchange period, H
had a bona fide intent to enter into a deferred
exchange of like-kind property within the meaning of
sec. 1.1031(k)-1(j)(2)(iv), Income Tax Regs.  Under
sec. 1.1031(k)-1(g)(3) and (j)(2), Income Tax Regs., H
was not in actual or constructive receipt of property
in 1994, and under the installment sale rules of sec.
453, I.R.C., Ps are not required to recognize income
from the deferred exchange in 1994.

David D. Aughtry and Brett W. Beveridge, for petitioners.

David R. MacKusick, for respondent.

THORNTON, Judge:  Respondent determined a $139,180 deficiency in petitioners' joint 1994 Federal income tax.  After concessions, the sole issue for decision is whether petitioners are required to recognize income in 1994 as the result of a deferred exchange that petitioner husband (petitioner) entered into in 1994 and that was completed in 1995.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for taxable year 1994.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference.

When they filed their petition, petitioners resided in Dublin, Georgia.

In the 1960's, petitioner acquired some 275 acres of timberland in Laurens County, Georgia.  By 1994, some of the timber on this land had reached maturity.  After attending a seminar on timber exchanges presented by a well-known timber taxation expert and after consulting with his longtime certified public accountant, petitioner decided to undertake an exchange of standing timber for additional acreage containing standing

timber.  As described in more detail below, on November 29, 1994, petitioner entered into a series of agreements with Rayonier, Inc. (Rayonier), whereby for a term of 2 years he granted Rayonier exclusive rights to cut and remove mature timber on some 95 acres of his Laurens County land (the 95 acres), in consideration of $517,076.  Pursuant to the agreements, most of the funds were held by an escrow agent and applied toward the purchase of three parcels of land as designated by petitioner.

More particularly, the "TIMBER CONTRACT" between petitioner and Rayonier, executed November 29, 1994, provides that in consideration of $517,076, petitioner grants Rayonier "the exclusive license and right to cut all merchantable pine and hardwood timber suitable for poles, sawtimber, or pulpwood, which are located within the timber sale boundaries of * * * [the 95 acres] now growing and hereafter to grow during the term hereof upon the land in Laurens County."  The timber contract states:

> The term of this contract shall be for a period commencing with the date hereof and ending on November 29, 1996 (24 months).  In the event * * * [Rayonier] has not completed the cutting and removing of said bargained timber at the expiration of the above stated term because of abnormal circumstances such as weather conditions, * * * [petitioner] [agrees] to extend the term of this contract for a period of time necessary to complete the harvesting of timber but in no event shall the extension exceed Six (6) months.

Pursuant to the terms of the timber contract, Rayonier was to pay the $517,076 purchase price, less $12,141 timber ad valorem taxes, to an escrow agent, Francis M. Lewis (Lewis).[1]

Also on November 29, 1994, petitioner and Rayonier executed a "MEMORANDUM OF CONTRACT", reciting that they had as of that date entered into the timber contract (referred to in the Memorandum of Contract as a "Timber Indenture Agreement"), whereby petitioner had conveyed to Rayonier:

> All merchantable pine and hardwood timber suitable for poles, sawtimber, or pulpwood, which are located within * * * [the 95 acres].

> * * * * * * *

> And, subject to the provisions of * * * [the timber contract], the right to cut and remove from the above-described lands all and singular of the said described trees and timber.

Petitioner recorded this memorandum of contract (but apparently not the timber contract) in the real property deed records of Laurens County, Georgia.

Also on November 29, 1994, petitioner and Rayonier executed a "TAX FREE EXCHANGE AGREEMENT". This agreement provides in relevant part:

> WHEREAS, * * * [Rayonier] and * * * [petitioner] have entered into an Agreement for the purchase of timber wherein * * * [petitioner] has agreed to sell to

---

[1] Francis M. Lewis is an attorney licensed to practice in the State of Georgia. He performed no services for petitioner during the 2-year period preceding Nov. 29, 1994, and is not related to petitioner.

* * * [Rayonier] and * * * [Rayonier] has agreed to purchase from * * * [petitioner] certain timber growing on property of * * * [petitioner]; and

WHEREAS, * * * [Rayonier] has agreed to cooperate with * * * [petitioner] in the effectuation of a tax free exchange, pursuant to Section 1031 of the Internal Revenue Code; and

WHEREAS, certain property will be designated by * * * [petitioner] to be acquired for the purpose of an exchange within one hundred eighty (180) days of the sale of the timber by * * * [petitioner] to * * * [Rayonier] and an escrow agent will be designated by * * * [petitioner] to receive and hold the monies from the sale as allowed by Section 1031 of the Internal Revenue Code; and

NOW, THEREFORE, for and in consideration of the mutual benefits and detriments to the Parties, IT IS AGREED AS FOLLOWS:

1.

The Parties hereto agree that the sell [sic] of the timber by * * * [petitioner] to * * * [Rayonier] is expressly conditioned upon reasonable cooperation and a tax free exchange qualifying under Section 1031 of the Internal Revenue Code, and all Parties to this Agreement agree to cooperate to the extent set forth herein. The acquisition by * * * [Rayonier] of the timber and the acquisition by * * * [petitioner] of the property to be designated are intended to be mutually interdependent transactions for the purpose of qualifying under Section 1031 of the Internal Revenue Code.

2.

* * * [Rayonier] shall upon the closing of the sale of the timber transaction between * * * [Rayonier] and * * * [petitioner] pay the total purchase price due for said timber to Francis M. Lewis, Escrow Agent, and not to * * * [petitioner].

Also on November 29, 1994, petitioner, Rayonier, and Lewis executed an escrow agreement. The agreement states that petitioner "intends for his exchange under * * * [the timber contract] to permit * * * [petitioner] to report the receipt of the exchange property under the income tax deferral rules of Section 1031(a) of the Internal Revenue Code". The escrow agreement provides that on the closing of the timber contract, Rayonier will deliver to Lewis the net purchase price ($517,076 less $12,141 ad valorem taxes) to be held in escrow and paid out as provided in the escrow agreement. The escrow agreement (wherein petitioner is referred to as Seller and Rayonier is referred to as Purchaser) further provides in part:

3.

Seller will designate certain real estate referred to in a Tax Free Exchange Agreement between Purchaser and Seller, which shall be acquired by Purchaser and transferred to Purchaser. The Escrow Agent agrees to apply the funds toward the purchase of the property as directed by the Purchaser.

* * * * * * *

6.

Title to the exchange property shall be acquired in the name of the Escrow Agent, as Agent for the Purchaser, and then conveyed by Escrow Agent to Seller. In the event the costs of acquiring and thereafter conveying the exchange property can be reduced by a direct transfer from the Seller [sic] of the exchange property to Seller, the Escrow Agent may arrange for a direct transfer to Seller upon receipt by Escrow Agent of a request from Seller.

7.

*     *     *     *     *     *     *

In no event shall Seller have use or control of the funds contained in escrow on or before termination of said escrow.  Seller shall not have the right to sell, assign, transfer, encumber or in any other manner anticipate or dispose of his interest in said escrow until the same is actually paid over to and received by Seller.

Pursuant to the escrow agreement and the timber contract, on November 29, 1994, Lewis received from Rayonier net proceeds of $504,935 (the escrow funds), which he deposited into a checking account at Farmers & Merchants Bank in Dublin, Georgia.  By three separate letters, dated December 18, 1994, December 21, 1994, and January 2, 1995, petitioner identified to Lewis as replacement properties three parcels of land (the replacement properties), ownership of each of which was transferred directly to petitioner by warranty deed from the respective owners as follows:

| Petitioner's letter to Lewis | Replacement property acreage | Ownership transferred to petitioner |
|---|---|---|
| Dec. 18, 1994 | 488.57 acres | Feb. 16, 1995 |
| Dec. 21, 1994 | [1]316.82 acres | Mar. 14, 1995 |
| Jan.  2, 1995 | 105.7  acres | Feb. 15, 1995 |

[1] The parties have stipulated that the land contained 316.82 acres, although the letter to Lewis states that the property contains 312 acres.  To the extent there is a discrepancy, it is immaterial to the result reached herein.

The replacement properties are all within 30 miles of the 95 acres.  When petitioner acquired these replacement properties, they all contained standing timber that accounted for a significant part of their value.

The purchase of these three replacement properties exhausted all but $205.45 of the escrow funds.  By check dated May 9, 1995, Lewis paid petitioner the $205.45 balance.

Petitioners are cash basis taxpayers.  On their joint 1994 Federal income tax return, filed on or about April 15, 1995, they characterized the subject transaction as a like-kind exchange of "Timber" for "Timber and Land", giving rise to $496,076 realized gain, all of which they treated as deferred gain pursuant to section 1031.

In the notice of deficiency, dated December 4, 1997, respondent determined that petitioners realized gain of $489,935, instead of $496,076, from their 1994 timber sale.[2]  The notice of deficiency states that "the realized gain from the sale of the timber is to be fully recognized [in 1994] because it has not been established that the requirements of section 1031 of the Internal Revenue Code have been met."

OPINION

A.   The Parties' Contentions

1.   The Like-Kind Exchange Requirement

Petitioners argue that to continue petitioner's timber investment, he exchanged standing timber for standing timber that

---

[2] The parties have stipulated that petitioner's basis in the timber conveyed to Rayonier was $3,200.  On brief, respondent contends that after subtracting this basis, the amount of petitioners' realized gain is $486,735.

necessarily had to have land attached. Petitioners argue that under applicable Georgia law, both the relinquished property and the replacement property are characterized as real property interests, and that under Commissioner v. Crichton, 122 F.2d 181 (5th Cir. 1941), affg. 42 B.T.A. 490 (1940), the subject transaction qualifies as a tax-deferred like-kind exchange within the meaning of section 1031.

Respondent argues that under Georgia law, the 2-year timber cutting contract was personal property and thus not of like kind to the replacement real property. In addition, relying on Oregon Lumber Co. v. Commissioner, 20 T.C. 192 (1953), respondent argues that regardless of how the property interests may be characterized under State law, the property relinquished and the properties received differ so intrinsically that they are not of like kind within the meaning of section 1031.[3]

### 2. Petitioners' Alternative Argument: Lack of Actual or Constructive Receipt in 1994

On brief, petitioners raise an alternative argument that regardless of whether the subject transaction qualifies as a

---

[3] Respondent does not dispute that petitioners have met all other requirements for a nontaxable exchange of property held for productive use in a trade or business or for investment within the meaning of sec. 1031. In particular, respondent does not dispute that petitioner's transaction with Rayonier constituted an "exchange" within the meaning of sec. 1031 or that petitioners have satisfied the requirements of sec. 1031(a)(3), which in the case of a nonsimultaneous exchange generally requires that the replacement property be identified no more than 45 days after, and the exchange be completed no more than 180 days after, the transfer of the relinquished property.

like-kind exchange, respondent has erroneously determined that they realized income from the transaction in 1994. Relying on section 1.1031(k)-1(g)(3) and (j), Income Tax Regs., petitioners argue that they realized no gain in 1994 because they had no actual or constructive receipt of property in 1994.

Respondent contends that petitioners have improperly raised this issue for the first time on brief. Respondent alleges, and petitioners do not dispute, that the 3-year limitations period for respondent to assess tax for taxable year 1995 ran shortly after the trial date of this case and shortly before the date respondent received a copy of petitioners' brief. Respondent contends that because of this circumstance, he is "especially prejudiced" by petitioners' delay in raising their alternative arguments.

In a memorandum filed with the Court in response to respondent's arguments on reply brief, petitioners argue that they raised what they characterize as the "receipt issue" frequently before and during trial. In their memorandum, petitioners catalog various references in their petition, their trial memorandum, the parties' stipulations of facts, and statements at trial to arguments or facts or circumstances in support of arguments that in 1994 petitioner never received or had access to or control over any moneys incident to the exchange in question.

B.    Lack of Prejudice to Respondent in Addressing Actual or
      Constructive Receipt

A party may rely on a theory only if it provides the opposing party fair warning so that the opposing party is not prejudiced in its ability to prepare its case.  See Pagel, Inc. v. Commissioner, 91 T.C. 200, 211 (1988), affd. 905 F.2d 1190 (8th Cir. 1990).  Accordingly, a party may not raise an issue for the first time on brief where surprise and prejudice are found to exist.  See Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986).  The general rule against raising new issues on brief is not absolute, being "founded upon the exercise of judicial discretion in determining whether considerations of surprise and prejudice require that a party be protected from having to face a belated confrontation which precludes or limits that party's opportunity to present pertinent evidence."  Ware v. Commissioner, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990).

Respondent does not contend that he has been prejudiced in developing or presenting evidence regarding petitioners' alternative argument.  In respondent's reply brief, respondent's response to motion by petitioners to supplement brief, and respondent's supplemental reply brief, the only prejudice that respondent suggests would arise from our consideration of petitioners' alternative argument relates to respondent's failure to determine a deficiency for petitioners' 1995 taxable year.  If

such prejudice exists, it is of respondent's own making.  Any such prejudice, however, is speculative, premised as it is on the supposed tax consequences in a year not before us of a legal determination that we decline to reach.  The only year before us is 1994, and we confine our determinations to that year.  See Christensen v. Commissioner, T.C. Memo. 1996-254, affd. without published opinion 142 F.3d 442 (9th Cir. 1998).

Moreover, petitioners' receipt argument is based on the application of section 1031 and respondent's regulations thereunder--the same section upon which the parties have based their positions from the outset.  See Ware v. Commissioner, supra.  In invoking the application of these mandatory provisions of the section 1031 regulations, petitioners appeal to the correct application of the law on the basis of the record presented.  Neither party has suggested that the record contains insufficient facts to permit us to dispose of the case on the grounds of petitioners' alternative argument.  We conclude that the record is sufficient for this purpose and that we may properly decide this case on the grounds raised in petitioners' alternative argument.[4]

---

[4] We are mindful that in Chase v. Commissioner, 92 T.C. 874, 883 (1989), this Court rejected the taxpayers' alternative argument, raised for the first time on brief, that if sec. 1031(a) were inapplicable to the transaction in question, then they should be allowed to elect installment sale treatment under former sec. 453.  The Court based its holding partly on the

(continued...)

C.    Coordination of Section 1031 Regulations and Section 453

The section 1031 regulations state:  "Except as otherwise provided, the amount of gain or loss recognized * * * in a deferred exchange is determined by applying the rules of section 1031 and the regulations thereunder."  Sec. 1.1031(k)-1(j)(1), Income Tax Regs.  The section 1031 regulations contain special rules for coordinating the determination of gain or loss under section 1031 and under section 453, which generally requires, subject to a host of qualifications not in issue here, that where

_____

⁴(...continued)
ground that the taxpayers had raised the issue for the first time on brief.  The Court cited Seligman v. Commissioner, 84 T.C. 191 (1985), affd. 796 F.2d 116 (5th Cir. 1986), and Markwardt v. Commissioner, 64 T.C. 989 (1975).  As germane here, each of these cases stands for the general proposition that this Court will not consider issues first raised in the parties' briefs where prejudice and surprise are found to exist.  Accordingly, we infer that the Court in Chase concluded that a holding for the taxpayers on their alternative argument would prejudice the Commissioner.

In any event, the Court in Chase concluded that the taxpayers were the wrong parties to claim the election under former sec. 453.  The election could be made only by the partnership in which they were partners.  By contrast, as applicable to the years in issue here, the provisions of sec. 453 are not elective but rather are generally mandatory; the taxpayer must elect out to avoid reporting gain or loss on the installment method.  See sec. 453(d).  Moreover, the sec. 1031 regulations applicable to the year in issue in Chase v. Commissioner, supra, unlike the sec. 1031 regulations applicable here, contained no explicit coordination with the installment sale provisions of sec. 453.  Accordingly, the taxpayers' alternative argument in Chase, unlike petitioners' alternative argument here, did not necessarily appeal to the correct application of the law pertaining to sec. 1031 but instead was predicated on other elective statutory provisions invoked for the first time on brief.

a taxpayer disposes of property and is to receive one or more payments in a later year, the taxpayer's profit on the sale is to be included in income as the payments are received.

For purposes of section 453, payments include amounts actually or constructively received in the taxable year. See sec. 15A.453-1(b)(3)(i), Temporary Income Tax Regs., 46 Fed. Reg. 48920 (Oct. 5, 1981). In the context of a deferred exchange where cash or a cash equivalent provides security for the transfer of replacement property and is held in an escrow account or trust, the question arises whether, for purposes of applying the installment sale rules of section 453, the taxpayer has actually or constructively received property at the commencement of the deferred exchange. To answer this question, the section 453 regulations cross-reference rules contained in section 1.1031(k)-1(j)(2), Income Tax Regs. See id. These section 1031 regulations generally provide that the determination of whether the taxpayer has received payment for purposes of section 453 will be made without regard to the fact that the transferee's obligation to convey replacement property to the taxpayer is secured by cash or cash equivalent, if the cash or cash equivalent is held in a "qualified escrow account" or "qualified trust" as defined in section 1.1031(k)-1(g)(3), Income Tax Regs., provided the taxpayer had a bona fide intent to enter into a deferred exchange of like-kind property at the beginning of the

exchange. See sec. 1.1031(k)-1(j)(2)(i), (iv), Income Tax Regs.[5]

Accordingly, in such a circumstance, if all other conditions of

section 453 are satisfied, the taxpayer must recognize any gain

or loss from such a deferred exchange pursuant to the installment

sale rules of section 453.

---

[5] The sec. 1031 regulations provide that, as a general rule:

> The taxpayer is in constructive receipt of money or
> property at the time the money or property is credited
> to the taxpayer's account, set apart for the taxpayer,
> or otherwise made available so that the taxpayer may
> draw upon it at any time or so that the taxpayer can
> draw upon it if notice of intention to draw is given.
> * * *  [Sec. 1.1031(k)-1(f)(2), Income Tax Regs.]

Strictly construed and without any further refinement, the principles expressed in these regulations might lead to the conclusion that petitioner had actual receipt of property in 1994 (either by virtue of the escrow agent's acting as his agent in receiving the escrow funds or by virtue of petitioner's receipt of a property interest in the escrow account) or constructive receipt of the sale proceeds. See Williams v. United States, 219 F.2d 523 (5th Cir. 1955) (taxpayers who sold standing timber and had sale proceeds placed in an escrow account were in constructive receipt of the proceeds at the time of the sale).

Under such an analysis, however, it might be difficult for any deferred exchange involving an escrow account to qualify under sec. 1031, because (1) the actual or constructive receipt might indicate a sale rather than an exchange, and (2) the property interest actually or constructively received at the commencement of the deferred exchange would not necessarily be like kind to the property relinquished. See 2 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 44.2.5 (3d ed. 2000). To mitigate such problems, sec. 1.1031(k)-1(g), Income Tax Regs., provides various safe harbors. See id. One of these safe harbors provides that in the case of a deferred exchange, the taxpayer is not in actual or constructive receipt of money or property merely because cash or a cash equivalent is held in a "qualified escrow account or in a qualified trust." Sec. 1.1031(k)-1(g)(3)(i), Income Tax Regs.

Here, petitioners contend that because they have met all operative conditions for the application of section 1.1031(k)-1(g)(3) and (j)(2), Income Tax Regs., and of section 453, by operation of law they have no actual or constructive receipt of property in 1994, and, under the rules coordinating gain recognition under sections 453 and 1031, they are not required to recognize income in 1994.  Respondent takes issue with only one operative condition relative to petitioners' argument--that petitioner had the requisite bona fide intent to enter into a deferred exchange at the beginning of the subject transaction.[6]

_____

[6] In particular, respondent has not disputed that the subject transaction was a deferred exchange within the meaning of the regulations, which define a deferred exchange as:

> an exchange in which, pursuant to an agreement, the taxpayer transfers property held for productive use in a trade or business or for investment * * * and subsequently receives property to be held either for productive use in a trade or business or for investment * * *  [Sec. 1.1031(k)-1(a), Income Tax Regs.]

Nor has respondent disputed that the escrow account used in the subject transaction was a "qualified escrow account" within the meaning of sec. 1.1031(k)-1(g)(3)(ii), Income Tax Regs., which defines a "qualified escrow account" as:

> an escrow account wherein--
>
>     (A) The escrow holder is not the taxpayer or a disqualified person (as defined in paragraph (k) of this section), and
>
>     (B) The escrow agreement expressly limits the taxpayer's rights to receive, pledge, borrow, or otherwise obtain the benefits of the cash or cash

(continued...)

Accordingly, we turn to consideration of that issue.

D.   Bona Fide Intent Test

Section 1.1031(k)-1(j)(2)(iv), Income Tax Regs., provides:

> Bona fide intent requirement.  The provisions of
> paragraphs (j)(2)(i) and (ii) of this section [which
> coordinate gain recognition rules under sections 453
> and 1031 with respect to a deferred exchange involving
> a qualified escrow account, qualified trust, or
> qualified intermediary] do not apply unless the
> taxpayer has a bona fide intent to enter into a
> deferred exchange at the beginning of the exchange
> period.  A taxpayer will be treated as having a bona
> fide intent only if it is reasonable to believe, based
> on all the facts and circumstances as of the beginning
> of the exchange period, that like-kind replacement
> property will be acquired before the end of the
> exchange period.

In arguing that petitioner lacked the requisite bona fide
intent, respondent takes issue only with whether it was
reasonable for petitioner to believe that the property he
relinquished and the properties he received in the subject
transaction were of like kind within the meaning of section 1031.
Respondent does not contend that petitioner otherwise failed to
satisfy the requirements of section 1.1031(k)-1(j)(2)(iv), Income

_____

6(...continued)
     equivalent held in the escrow account as provided in
     paragraph (g)(6) of this section.

Furthermore, respondent has not contended that the subject
transaction fails to meet any of the conditions for application
of sec. 453, other than as relate to the satisfaction of the bona
fide intent requirement of sec. 1.1031(k)-1(j)(2)(iv), Income Tax
Regs.

Tax Regs. (the bona fide intent test).[7]  Accordingly, we focus

our inquiry on that aspect of the bona fide intent test.

On reply brief, respondent argues as follows:

Here, petitioner's intent was always to acquire
precisely the type of replacement property he
ultimately acquired.  There is no evidence anywhere in
the record to suggest that petitioner intended to
acquire as replacement property anything but a fee
simple interest in timberland.  Since the replacement
properties and the relinquished property are not like
kind, petitioner's intent from the outset was to
acquire replacement property that was not of like kind
with the relinquished property and Treas. Reg. sec.
1.1031(k)-1(j)(2)(iv) does not apply.  The regulation
does not address the situation such as here where the
taxpayer actually acquires the replacement property he
intended to acquire and which does not qualify as like
kind with the relinquished property.

Respondent's argument is at odds with the bona fide intent test

as described in his own regulations, which requires only that it

be "reasonable to believe" that like-kind replacement property

will be acquired within the requisite exchange period.  Sec.

1.1031(k)-1(j)(2)(iv), Income Tax Regs.

As explained in greater detail below, we conclude that at

the commencement of the exchange period for the subject

transaction, petitioner had a bona fide intent that he would

satisfy the like-kind deferred exchange requirements.  This

conclusion is bolstered by the fact that respondent has

---

[7] For instance, respondent does not contend that petitioner
did not reasonably believe that he would acquire replacement
property within the requisite 180-day period.

determined no negligence penalty or other penalty with regard to the subject transaction, from which we infer that respondent does not dispute that petitioners had reasonable cause and acted in good faith in treating the subject transaction as a tax-deferred like-kind exchange within the meaning of section 1031. See sec. 6664(c)(1) (no accuracy-related penalty is to be imposed to the extent there was reasonable cause and the taxpayer acted in good faith).

E.    Application of the Bona Fide Intent Test

In Oregon Lumber Co. v. Commissioner, 20 T.C. 192 (1953), the taxpayer conveyed to the United States certain land adjoining national forests in Oregon and containing a specified amount of standing timber. In exchange, the United States granted the taxpayer the right to cut and remove national forest timber of equal value on acreage to be definitely designated by the national forest officer before cutting. This Court concluded that under Oregon State law, because an agreement to cut and remove standing timber from the land immediately or within a reasonable time was an agreement for the sale of goods only, the property rights acquired under the agreement were personalty. See id. at 196. Accordingly, this Court held that the taxpayer's exchange was of realty for personalty and was thus not an exchange of properties of like kind. See id.

Noting that some Oregon case law arguably supported a contrary view that a sale of standing timber is deemed to be a conveyance of an estate upon condition subsequent, this Court stated:

> Arguendo, if, from the record, we were able to find and hold that the standing timber was realty in the hands of the petitioner, we must nevertheless reach the same conclusion as above for the reasons stated below.
>
> \*    \*    \*    \*    \*    \*    \*
>
> * * * petitioner exchanged a fee simple title for a limited right to cut and remove standing timber. It is our conclusion that the right to cut and remove standing timber is so intrinsically different from a fee in land that an exchange of one for the other is not an exchange of like property within * * * [the meaning of the predecessor statute to section 1031].  [Id. at 197.]

Petitioners argue that Oregon Lumber Co. v. Commissioner, supra, is distinguishable because under Georgia State law, both sets of property involved in petitioner's exchange constituted realty.  Furthermore, petitioners argue, the above-quoted statements from Oregon Lumber are dicta and thus not controlling.

We agree with petitioners that under Georgia State law, the prevailing view appears to be that a conveyance of standing timber, to be severed by the buyer, generally constitutes a transfer of real property.  See Smith v. Alexander & Bland, 148 S.E. 98 (Ga. 1929); McLendon Bros. v. Finch, 58 S.E. 690, 691-692 (Ga. 1909); McRae v. Stillwell, 36 S.E. 604 (Ga. 1900); Chavers

v. Kent Diversified Prods., Inc., 389 S.E.2d 261, 262-263 (Ga.

Ct. App. 1989).[8]

_____

   [8] Some Georgia case law arguably supports respondent's contention that the property petitioner relinquished constituted personalty.  In Johnson v. Truitt, 50 S.E. 135, 136 (Ga. 1905), the contractual right of a purchaser to cut standing timber within 12 months was referred to as "merely a license to cut and remove the timber for the purposes stated, during the time fixed in the contract."  See also Graham v. West, 55 S.E. 931 (Ga. 1906) (sale of standing timber where the growing trees are to remain in the soil for a fixed time or indefinitely concerns an interest in the land, but if the trees are to be immediately severed and carried away, the sale is of personal property).  In North Ga. Co. v. Bebee, 57 S.E. 873, 874 (Ga. 1907), the Georgia Supreme Court cited Johnson v. Truitt, supra, with approval for the proposition that "the owner of the land may convey a right to cut and remove timber within a specified time, in which case the absolute title to the timber described does not pass to the purchaser, but only a license to use it for the purpose stated, during the period specified in the contract."  To the same effect, see also Seabolt v. Christian, 60 S.E.2d 540, 543 (Ga. Ct. App. 1950); Pope v. Barnett, 163 S.E. 517, 518 (Ga. Ct. App. 1932).

   In Camp v. Horton, 63 S.E. 351, 353 (Ga. 1909), the Georgia Supreme Court reviewed other Georgia precedents to contrary effect and concluded that the above-quoted language from Johnson v. Truitt, supra, was "not essential to the decision of the case or the correctness of the judgment".  See also Chavers v. Kent Diversified Prods., Inc., 389 S.E.2d 261, 263 (Ga. Ct. App. 1989) (dicta in Johnson v. Truitt, supra, is not controlling).

   In short, on the issue of whether an agreement for the sale of growing trees is a contract for the sale of an interest in land, Georgia State law is less than a seamless web of jurisprudence.  In this regard, Georgia State law is not unique. With regard to this legal issue, among the various States "There is considerable difference of opinion, often in the same jurisdiction, * * * undoubtedly due to diverse theories of the courts with respect to the exact nature of standing trees." Davis, Annotation, Sale or Contract for Sale of Standing Timber as Within Provisions of Statute of Frauds Respecting Sale or Contract of Sale of Real Property, 7 A.L.R.2d 517, 518 (1949).

In arguing that the properties are of like kind, petitioners rely in part on <u>Commissioner v. Crichton</u>, 122 F.2d 181 (5th Cir. 1941), which held that an undivided fractional interest in mineral rights on unimproved country land was of like kind to undivided interests in improved city lots. Petitioners cite <u>Crichton</u> for the proposition that section 1031 is to be liberally construed to effect legislative intent and that the only distinction that would justify disqualification must be "the broad one between classes and characters of properties, for instance, between real and personal property." <u>Id.</u> at 182; see also sec. 1.1031(a)-1, Income Tax Regs.[9] Petitioners argue that

---

[9] In pertinent part, sec. 1.1031(a)-1, Income Tax Regs., provides as follows:

> (b) Definition of "like kind." As used in section 1031(a), the words "like kind" have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not, under that section, be exchanged for property of a different kind or class. The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. Unproductive real estate held by one other than a dealer for future use or future realization of the increment in value is held for investment and not primarily for sale. * * *

> (c) Examples of exchanges of property of a "like kind." No gain or loss is recognized if * * *

(continued...)

under <u>Crichton</u>, "the conveyance of an entire interest in a delineated natural resource treated as real property under state law constitutes like kind property * * * when exchanged for other real property interests." In support of their position, petitioners also cite Rev. Rul. 68-331, 1968-1 C.B. 352 (leasehold interest in a producing oil lease is like kind to an improved ranch), and Rev. Rul. 55-749, 1955-2 C.B. 295 (perpetual water rights are like kind to land).

On the other hand, not every exchange of real property interests meets the section 1031 like-kind requirement. See <u>Koch v. Commissioner</u>, 71 T.C. 54, 65 (1978) (holding that real estate subject to a long-term lease is like kind to real estate not so encumbered).[10] For instance, carved-out oil payments, although characterized as real property under State law, are not like kind to a fee interest in real estate. See <u>Fleming v. Commissioner</u>,

---

[9](...continued)

    (2) a taxpayer who is not a dealer
in real estate exchanges city real estate for
a ranch or farm, or exchanges a leasehold of
a fee with 30 years or more to run for real
estate, or exchanges improved real estate for
unimproved real estate * * *

[10] In <u>Koch v. Commissioner</u>, 71 T.C. 54, 65 (1978), this Court stated that sec. 1031 requires a comparison of all factors bearing upon the "nature and character" of the exchanged properties as opposed to their "grade or quality." These factors include "the respective interests in the physical properties, the nature of the title conveyed, the rights of the parties, [and] the duration of the interests". <u>Id.</u>

24 T.C. 818, 823-824 (1955), revd. 241 F.2d 87 (5th Cir. 1957), revd. sub nom. <u>Commissioner v. P.G. Lake, Inc.</u>, 356 U.S. 260 (1958); see also <u>Clemente, Inc. v. Commissioner</u>, T.C. Memo. 1985-367 (8-acre parcel of land was not like kind to gravel extraction rights in another parcel of land).  In addition, for purposes of section 1031, a short-term leasehold of real property is not equivalent to a fee interest.  See <u>Capri, Inc. v. Commissioner</u>, 65 T.C. 162, 181-182 (1975); <u>May Dept. Stores Co. v. Commissioner</u>, 16 T.C. 547, 556 (1951); <u>Standard Envelope Manufacturing Co. v. Commissioner</u>, 15 T.C. 41, 48 (1950).[11]

Because of the posture of this case, it is unnecessary, and we do not undertake, to resolve the legal issue whether the like-kind requirement was satisfied.  It suffices to find, as we do, that petitioner had a bona fide intent that the subject transaction would meet the like-kind exchange requirement, taking into account that it constituted an exchange of realty for realty.

Other relevant factors indicating that petitioner had, at the beginning of the exchange period, a bona fide intent that like-kind property would be acquired before the end of the 180-

---

[11] Notably, this characterization of short-term leasehold interests derives not from any particular State law but from negative implication of longstanding Treasury regulations which provide that an exchange of a 30-year lease for a fee interest qualifies as a like-kind exchange under sec. 1031.  See sec. 1.1031(a)-1(c), Income Tax Regs.

day exchange period include: (1) The agreement that petitioner and Rayonier entered into on November 29, 1994, expressly made the transaction conditioned on "reasonable cooperation and a tax free exchange qualifying under Section 1031"; (2) petitioner used a qualified escrow account and a proper escrow agent as required by section 1.1031(k)-1(g)(3), Income Tax Regs.; (3) petitioner identified and received the replacement properties within the 45-day and 180-day periods as required by section 1031(a)(3); (4) petitioner testified credibly that he intended to have a like-kind exchange; and (5) in planning the transaction, petitioner relied on advice from a well-known timber taxation expert and from his long-time accountant. Moreover, as previously mentioned, respondent has determined no negligence or accuracy-related penalty in regard to the subject transaction.

F. Conclusion

In light of all the facts and circumstances, we conclude and hold that petitioners have satisfied the bona fide intent test and that under section 1.1031(k)-1(j), Income Tax Regs., petitioners had no actual or constructive receipt of property in 1994 for purposes of applying the installment sale provisions of section 453. We conclude and hold that petitioners recognized no gain from the subject transaction in 1994 and that respondent's determination was in error.

In light of this holding, it is unnecessary to decide the issue of whether the subject transaction qualifies as a like-kind exchange within the meaning of section 1031.

To reflect the foregoing and the parties' concessions,

<u>Decision will be entered under Rule 155</u>.