*Decisions will be entered under Rule 50.*

THE MAY DEPARTMENT STORES COMPANY (SUCCESSOR OF KAUFMANN DEPARTMENT STORES, INC., BY MERGER AND CONSOLIDATION), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

KAUFMANN DEPARTMENT STORES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23855, 23859.   Promulgated March 1, 1951.

*Sidney B. Gambill, Esq.*, and *Thomas J. McManus, Esq.*, for the petitioners.

*Kalman A. Goldring, Esq.*, for the respondent.

548

**OPINION.**

Disney, *Judge:* The parties are in agreement that if the transaction resulted in a sale for tax purposes within the meaning of the statute, the ordinary loss sustained was in the amount of $2,041,617.90, instead of the amount deducted by petitioner in its return and disallowed by respondent in his determination of the deficiencies.

Section 23 (f) of the Internal Revenue Code allows as deductions from gross income "* * * losses sustained during the taxable year * * *."

The basic difference between the parties is whether the transaction completed on December 30. 1943, was a sale within the meaning of the statute authorizing deductions for losses sustained through sales of property. Petitioner contends that the transaction involved an irrevocable sale of the property in an arm's length transaction, and accordingly was bona fide and real for tax purposes. Respondent disallowed the deduction without giving any reason for his action. On brief, he argues that petitioner never intended to convey any substantial interest in the property and did not part with control thereof, and that the purported consideration was inadequate for a bona fide transfer, in view of which the transaction is not recognizable as a sale giving rise to a deductible loss.

Sale of the property by petitioner was discussed prior to 1943. In that year, when the fair market value of the property was considerably less than its adjusted cost basis, petitioner decided to dispose of it and take the loss. Petitioner first offered the property to the Union Trust Co. and it agreed to purchase the property as an investment for trusts for $460,000 an amount $10,000 in excess of the value of $450,000 placed upon the property by its real estate department, subject to a lease back to obtain a return on the investment and advice of counsel that the real estate could be acquired as a trust investment. After learning that counsel had advised the Union Trust Co. that it had no power to acquire the property for the intended purpose, petitioner offered it to an individual, financially able to buy the property, for $500,000 cash with a lease back at an annual rental of $35,000 over a term of 20 years. The offer was declined on account of insufficient return on the investment. Thereafter Wallerstedt learned that the property was for sale and negotiations for its purchase led to the acquisition thereof on terms described in full in our findings of fact.

The sale was completed by the delivery of a deed conveying, without reservations, all of the seller's right, title and interest in the property to the buyers in undivided one-fourth interests and a mortgage and bond to secure payment of the deferred purchase price of $360,000. Concurrently with the delivery of the instruments and as an integral part of the whole transaction, the parties executed a lease on the property for a term of 20 years, without renewal privileges, at an annual rental of $32,200, an amount equal to 7 per cent of the sale price of the property. The form of the transaction as thus carried out has all of the usual earmarks of a transaction involving a bona fide sale with a lease back on the property sold. The substance as will be pointed out does not differ from form.

We agree with respondent that the entire transaction must be considered to determine whether a sale occurred for loss deduction purposes. A sale of property coupled with a lease back is not of itself sufficient to reject the sale as lacking reality for tax purposes. *Standard Envelope Mfg. Co.*, 15 T. C. 41. Whether petitioner will ultimately sustain less loss, or realize gain, is, as respondent concedes, not decisive. That it was aware that a sale of the property would result in tax savings is not denied by petitioner's counsel. Such a purpose is not sufficient grounds for denying a deduction if in other respects the transaction resulted in an actual loss. *Gregory* v. *Helvering*, 293 U. S. 465. A corporation may, within the statute, so conduct its affairs as to avoid or reduce tax burdens. *United States* v. *Cumberland Public Service Co.*, 338 U. S. 451.

The uncontradicted testimony of each of the buyers, Kaufmann, Clarkson and Irwin D. Wolf, who executed the deed and lease on

behalf of petitioner, is that no agreement exists for the reconveyance of the property or extension of the lease beyond the 20-year term thereof. Under the circumstances, it would be unrealistic to regard petitioner as not having relinquished any substantial interest in the property, as respondent contends.

Notwithstanding the lack of a renewal clause in the lease agreement and in spite of the evidence disclosing lack of agreement between the interested parties outside of the instrument for an extension of the term, respondent says that the grantees-lessors were sufficiently under petitioner's control to obtain a renewal, if desired. The grantees were not, by proof here, under any contractual obligation denying them the right to dispose of the property subject, of course, to the mortgage and lease. To deny the deduction on the ground of control in the petitioner would require us to say that petitioner could exercise power over the disposition of the property by the grantees.

As evidence of control over the property, respondent refers to an alleged attorney-client relationship between the grantor and the grantees and contends that in the absence of an agreement to reconvey or extend the term of the lease the courts will imply such an understanding. The basis for the argument is that the buyers were "members and associates of the law firm representing petitioner." The law firm was and had been petitioner's counsel. Respondent admits that Phillips, one of the four buyers, had no connection with the law firm and the alleged rule could not possibly apply to him. Wallerstedt's connection with the law firm was that of an employee and, therefore, petitioner could not be regarded as one of his clients. Respondent points to no evidence establishing that Booth and Johnson were actually members of the firm. The evidence in the case is no more than that Booth was "of" and that Johnson was "associated" with, the firm. Johnson is now associated with another law firm. Under the circumstances, we are unable to find that the relationship of attorney-client existed between petitioner and the buyers at the time of the transaction. So concluding, there is no need for further discussion of the question.

The other argument of respondent is that the consideration was inadequate to evidence a bona fide transfer. He contends that the property had a fair market value of $1,300,000, the value placed upon the property by Wallerstedt in May 1948 when testifying before a Board of Reviewers of Allegheny County concerning assessments of damages incurred by the widening of Cherry Way. It is not shown by the evidence here whether the value testified to was as of the time of condemnation in 1946 or the date of the hearing. Values continued to increase from 1944 through 1948, so the $1,300,000 value is no

proof of value in December 1943. There is other evidence in the case on the value of the property at the time of sale, none of which can be disregarded in determining whether actual value was so greatly in excess of sale price as to affect the bona fides of the transaction.

The offer of the Union Trust Co. to purchase the property for $460,000 resulted from an appraisal made by the general manager of its real estate department with the help of an assistant. He testified here that the appraisal in the amount of $450,000 was made by him and his assistant without any discussion of the matter with the officer in charge of the trust department who was handling the matter with Kaufmann, or Kaufmann. Respondent did not question the qualifications of the witness or cross-examine him. Another real estate valuation expert, whose qualifications as such were conceded by respondent, testified on behalf of petitioner that the sales price of $460,000 was the fair market value of the property at that time. The testimony of these witnesses and other evidence in the case concerning the value of the property convinces us that the sales price of $460,000 was the fair market value of the parking lot on December 30, 1943, and we have so found as a fact.

Respondent cites several cases, primarily as illustrations of the theory being argued by him here. None of them is relied upon as controlling the issue here. The question before us being factual, it would be unusual to find a decided case with parallel facts. One case, *Catherine G. Armston*, 12 T. C. 539, like here, involved a lease back but distinguishable facts. There, machinery being used in the business of a family corporation was purportedly sold to the corporation's chief stockholder, with a lease back. The alleged purchaser did not have funds necessary for the transaction. She made a bank loan on the security of her stock and paid the alleged selling price from the proceeds of the loan. "Rent" paid and accrued on the machinery during the first five months was only a few hundred dollars less than the "sales" price. "Rent" at the same rate continued during the remainder of that year. The loan was paid out of money received as rent. The corporation would not have sold the machinery to an "outsider." We held that the alleged rentals were, in effect, distributions of corporate earnings.

In *Bank of America Nat. Trust & Savings Assn.*, 15 T. C. 544, the petitioner there transferred to a wholly owned subsidiary of a holding company, which owned a substantial interest in it, real properties at less than their adjusted cost bases. About 30 days later the grantee conveyed, for the price it paid, title to a wholly owned subsidiary of the original grantor, which had no employees and whose only business was to hold property for lease to the taxpayer. In denying losses on

the purported sales, we held that the first grantee was a mere conduit for conveyance of title to the second grantee, which, with its property, was under complete control of the taxpayer. No like situation prevails here.

A case having facts similar to those here is *Standard Envelope Mfg. Co., supra.* There the taxpayer, a corporation, held a 99-year lease on land, improved by a plant having an adjusted cost basis of about $65,000, at an annual rental of $7,500, with an option to purchase the land prior to June 1, 1947, for $125,000. The lease was not otherwise cancellable. The plant was not large enough for the lessee's requirements and it was advised that the rent was excessive. The lessee was unable to obtain a reduction of the rent or the option price of the land or a new location for a plant. In October 1944 the lessee elected to purchase the property and in December 1944 purchased the land at the option price of $125,000, after obtaining appraisals of $60,000 and $68,000 on the entire property. Later in the same month the corporation offered the property for sale for $75,000 with a lease back for a term of 3 years with a right of cancellation if it located a suitable place for its business. After considerable effort the property was sold on December 23, 1944, for $70,000 with a right to continue to occupy the premises as lessee for a rental of $6,000 per annum and an option to enter into a lease agreement, exercisable on or before July 1, 1945, for a term of 24 years. The corporation could not obtain a desirable location elsewhere and in June 1945 exercised the option to lease the property. Tax consequences were considered in connection with the transactions. The corporation had no control over the purchaser. We held that the sale was bona fide and resulted in a deductible loss.

A similar situation prevails here. Petitioner gave up, without reservations of any kind, fee simple title in the property for consideration equal to its fair market value at the time to buyers over whom it had no dominion or control, and received from the buyers, as part of the whole transaction, a lease on the property sold for a term of 20 years, at a rental agreeable to all parties concerned, with no renewal rights. Under the circumstances prevailing here, petitioner's property and economic interests after the transaction were different from its position in that regard before the deal was consummated. Its loss was actual and beyond recovery.

All other arguments of respondent have been carefully considered and found to be without controlling effect. Accordingly, we find that petitioner sustained a deductible loss of $2,041,617.90 on the sale of the parking lot.

*Decisions will be entered under Rule 50*