126 T.C. No. 14


UNITED STATES TAX COURT


PEABODY NATURAL RESOURCES COMPANY, f.k.a. HANSON NATURAL
RESOURCES COMPANY, CAVENHAM FOREST INDUSTRIES, INC., A PARTNER
OTHER THAN THE TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20328-04, 6899-05.      Filed May 8, 2006.


        A partnership exchanged operating gold mines,
including realty, for operating coal mines.  The coal
mines were subject to two coal supply contracts that
obligated the mine owner to provide electric utilities
with coal.  The benefits and obligations under the
contracts were governed by New Mexico law.  The gold
mines were not subject to supply contracts.  The
partnership treated the entire exchange as "tax free"
under sec. 1031, I.R.C.  R determined that the coal
supply contracts were not real property and/or like-
kind property and constituted "boot" so that the value
of the supply contracts would be taxable in the year of
the exchange.

        Held:  The coal supply contracts were covenants
running with and appurtenant to the real property under

New Mexico law.  <u>Held</u>, <u>further</u>, amplifying the holding in <u>Koch v. Commissioner</u>, 71 T.C. 54 (1978), the coal supply contracts are "like-kind" property within the meaning of sec. 1031, I.R.C., and are not taxable as part of the exchange.

<u>Martin D. Ginsburg</u>, <u>Alan S. Kaden</u>, and <u>Richard A. Wolfe</u>, for petitioner.

<u>Alan M. Jacobson</u> and <u>Donald L. Wells</u>, for respondent.

OPINION

GERBER, <u>Chief Judge</u>:  The parties filed motions for summary judgment[1] under Rule 121[2] at docket No. 20328-04 with respect to the issue of whether coal supply contracts that burdened coal mine property received by a partnership, as part of an exchange under section 1031, are like-kind property to the gold mining property transferred by the partnership.

<u>Background</u>

On June 25, 1993, Peabody Natural Resources Co. (a partnership then known as Hanson Natural Resources Co.) (Peabody)

---

[1]Respondent filed a cross-motion for partial summary judgment, as his position, if correct, would not have resolved all controversy between the parties.  However, the partnership's position, if correct, would be dispositive of all matters in controversy.

[2]All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references, unless otherwise indicated, are to the Internal Revenue Code as amended and in effect for the years in issue.

transferred the assets of its gold mining business to Santa Fe Pacific Mining Corp. (Santa Fe), an unrelated corporation, in exchange for the assets of Santa Fe's coal mining business. The parties to the exchange agreed that the mining assets exchanged by each had a total value of approximately $550 million. Peabody treated the transaction as a like-kind exchange under section 1031.

The transfer by Peabody to Santa Fe was of gold mines and other gold mining property (including buildings and other improvements, machinery and equipment, and mine exploration and development rights). In exchange, among other things, Peabody (1) received from Santa Fe the Lee Ranch coal mine in New Mexico (which included fee simple land and coal leases to other land giving the leaseholder rights to the coal in place) and (2) assumed all obligations of Santa Fe under two long-term coal supply contracts entered into in the early 1980s by Santa Fe with Tucson Electric Power Co. (TEPCO) and Western Fuels (WEF), respectively. The Lee Ranch was in a remote part of New Mexico and consisted of 13,594 acres of fee simple land and 1,800 acres of leased coal land. During the early 1990s, the annual coal output of the Lee Ranch mine was approximately 3.2 million to 5.0 million tons. At the time of the June 25, 1993, exchange, the Lee Ranch mine contained coal reserves of approximately 200

million tons.  The gold mines received by Santa Fe were not burdened by gold supply contracts.

The TEPCO supply contract began during 1983.  In connection with TEPCO's 1991 bankruptcy, however, the contract was renegotiated resulting in a coal price reduction from the original 1983 contract.  The renegotiated contract was for a period ending December 31, 2009.  Either party, however, could extend the contract for additional 5-year periods if the parties were able to negotiate a good faith price that reflected the then-current market price for coal.  Under the contract, Santa Fe was the exclusive supplier of the coal required for the operation of Units 1 and 2 of TEPCO's Springerville Station power plant, and TEPCO was obligated to purchase a specified annual minimum amount of coal.  There was no maximum limit on the amount of coal that Santa Fe could sell to TEPCO under the contract.  The contract, however, did contain estimates that the combined requirements of Springerville Station Units 1 and 2 would range from .6 million to 2.34 million tons per year during the term of the contract.  The quality of the coal was defined in the contract, and the type of coal specified in the contract was the type of coal produced in the Lee Ranch mine.  Under the contract, Santa Fe committed to use its best efforts to mine the Lee Ranch mine's coal reserves and to sell TEPCO the amount of coal needed for operation of the Springerville Station power plant.

The per-ton price of coal under the TEPCO contract was a base price adjusted by Santa Fe's actual mining costs. The contract was to run through December 31, 2009, or until the retirement of the power station but could be reopened for contract price renegotiation during July 2008 and at 5-year intervals after 2010. Specifically, the contract term was to extend until the earlier of either: (1) The date when Springerville Station Units 1 and/or 2 were retired from commercial operation; or (2) sometime after December 31, 2009, if the parties were unsuccessful in their good faith price renegotiations for any contract extension period. During the contract term Santa Fe was not permitted to sell coal to others if such sales would impair its ability to satisfy the supply contract obligations to TEPCO.

The TEPCO supply contract "[inured] to the benefit of and [was] binding upon the Parties and their respective successors and assigns." The original 1983 contract allowed each party to assign its rights and duties so long as the assignee or delegatee "assumes" the rights and duties of the assignor and so long as the assignee or delegatee is "capable of performing this Agreement." The 1983 contract also required any assumption by an assignee to be accomplished in a written document entered into with the other parties to the 1983 contract.

The WEF supply contract, also entered into in 1983, was between Santa Fe and WEF, a nonprofit cooperative comprising a group of relatively small electric utilities. WEF, in turn, would sell the coal to another cooperative, Plains Electric Generation & Transmission Cooperative, Inc. (Plains), for use in its Escalante Power Plant. Although the WEF supply contract is primarily between Santa Fe, as the seller, and WEF, as the buyer, that supply contract identified Plains as the guarantor of WEF's performance under that contract. That contract contained the recitation that WEF and Plains "desire to secure a reliable and reasonably priced supply of coal of the quality and quantities as set forth herein for use in the generation of electricity in Unit I, and potentially in an additional Unit II, of the [Escalante] Station." That contract also contained a price renegotiation provision that took effect in 1993 under which WEF could terminate the contract if a new long-term coal price were not negotiated.

On account of WEF's deteriorating financial condition, it sought to renegotiate its contract. During 1990 the pricing provisions were modified resulting in coal price reductions and changes in other contract provisions. The renegotiated WEF contract ran until December 31, 2004, and could be extended for up to three 10-year periods by either party. Each 10-year extension depended on the parties' ability to renegotiate and

agree to a new coal price which, in the parties' views, reflected the then market price for coal.

Santa Fe was required to maintain coal reserves adequate to supply the quantity of coal called for under the WEF contract. The WEF contract provided that any party subsequently acquiring an interest in the Lee Ranch mine coal reserves "shall take such interest subject to the dedication and reservation" of said reserves. The contract also provided that the "dedication" was not intended to be construed as a transfer to WEF of an interest in the coal in place, but that it was "imposed as and * * * [constituted] both an equitable servitude binding upon * * * [Santa Fe] and * * * [its] successors and assigns and a covenant running with * * * [Santa Fe's] interest".

The contract price was based on a complex formula that, to some extent, was based on the variable and fixed costs incurred by Lee Ranch mine in supplying coal under the contract. Under the WEF contract, Santa Fe was the exclusive supplier of the Escalante Station's coal needs within minimum quantity and quality standards, on an annual basis, with no limit on the amount of coal that could be sold to WEF. The contract, however, did contain an estimate of the Escalante Station's requirements as being .5 million to 2.3 million tons per year. Under the WEF contract, Santa Fe had "the right to supply all of the Usage * * * for each Year." Santa Fe could not sell coal from the Lee

Ranch mine to others if doing so would impair its ability to satisfy its coal supply contract obligations to WEF.

The WEF contract terms were to be interpreted under the laws of New Mexico.  Under the WEF contract, Santa Fe would be allowed to supply coal from mines other than Lee Ranch mine if it were unable to remove coal from Lee Ranch mine on account of a force majeure.  The WEF supply contract provided that it would "inure to the benefit of and be binding upon the Parties and their respective successors and assigns."

Peabody and Santa Fe determined that the mining assets each exchanged had a total value of approximately $550 million.  In accordance with section 1.1031(j)-1(a)(2), Income Tax Regs., Peabody separated into exchange groups the assets it transferred and received.  Peabody treated the gold mines, coal mine reserves, and appurtenant supply contracts as real property.  It valued the Lee Ranch mine coal reserves at $272.1 million.  On its income tax returns for the years in issue, Peabody treated its exchange of the gold mining assets for coal mining assets as a like-kind exchange under section 1031.

In the notices of final partnership administrative adjustment for Peabody's taxable years ended March 31, 1994 through 1996, and its short taxable year ended June 30, 1996, respondent determined that the supply contracts were not like-kind property as to which Peabody was entitled to nonrecognition treatment under section 1031.

## Discussion

The focus of this case concerns a section 1031 like-kind exchange of gold mines for coal mines. Respondent acknowledges that the coal mines and gold mines are like-kind property as to which Peabody is entitled to nonrecognition treatment under section 1031(a). In petitioner's motion for summary judgment and respondent's cross-motion for partial summary judgment, the parties disagree about whether two coal supply contracts are real property and/or like-kind property within the meaning of section 1031 (i.e., whether the coal supply contracts are boot).

Initially, we must decide whether the coal supply contracts are considered or treated as real property under New Mexico law. We must also decide whether those contracts, in the setting of this case, constitute "like-kind" property within the meaning of section 1031.

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trial. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Summary judgment may be

granted with respect to a legal issue, if there is "no genuine issue as to any material fact and * * * a decision may be rendered as a matter of law."  Rule 121(a) and (b); <u>Craig v. Commissioner</u>, 119 T.C. 252, 259-260 (2002); <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).  There is no disagreement between the parties as to a material fact, and therefore this matter is ripe for summary judgment.

I.  <u>New Mexico Law:  Are the Supply Contracts Real Property?</u>

Petitioner argues that the supply contracts are real property under New Mexico law, whereas respondent argues the contracts are not real property but some type of intangible right.

A.  <u>Petitioner's Arguments</u>

Petitioner contends that the supply contracts are real property under New Mexico law.  Petitioner asserts that each contract established a servitude under which Santa Fe and successive owners of the Lee Ranch mine land have the obligation to mine and supply the coal needed pursuant to that contract to operate the utility's power plant.  This servitude, petitioner maintains, is a real property interest under New Mexico law.

B.  <u>Respondent's Arguments</u>

Respondent contends that the supply contracts are not real property under New Mexico law, relying on the fact that the contracts did not result in a transfer of ownership of the coal

to the buyer/utility. Respondent also points out that under neither contract did the utility have the right to go onto the Lee Ranch land and extract coal. Instead, respondent contends Peabody had to mine and supply the coal required by the utility's power plant. Accordingly, respondent concludes that the supply contracts are not real property but contracts to sell personal property. See Townsend v. State ex rel. State Highway Dept., 871 P.2d 958, 959 (N.M. 1994) (observing that though mineral-in-place interests constitute real property, the underlying minerals are transformed into personal property when the mineral or physical substance is severed from the land).

C. Analysis of Coal Supply Contracts Under New Mexico Law

We begin our analysis by noting that the supply contracts are contracts for the sale of goods under New Mexico law. In addition, each contract created a servitude obligating Santa Fe and subsequent owners of the Lee Ranch mine to extract and supply coal to the power plant. We conclude that under New Mexico law, the supply contract servitudes constitute real property interests, for reasons we will discuss.

1. Status as Contracts for the Sale of Goods

Minerals in place (i.e., minerals lying unworked beneath or on the surface of the land) are considered part of that land, and an interest in minerals in place is real property for purposes of New Mexico law. Interests in minerals in place can be separately

conveyed to and held by someone other than the owner of the surface estate.  After the minerals are severed and removed from the land, they become personal property.  See generally id. at 959; 58 C.J.S., Mines and Minerals, sec. 141 (1998).

As pertinent to this case, New Mexico has adopted section 2-107 of the Uniform Commercial Code, which addresses minerals to be severed from realty by the seller.  In pertinent part, N.M. Stat. Ann. section 55-2-107 (Michie 1993) provides:

> Sec. 55-2-107.  Goods to be Severed from Realty; Recording
>
> (1)  A contract for the sale of minerals or the like (including oil and gas) *  *  * to be removed from realty is a contract for the sale of goods within this article if they are to be severed by the seller but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell.
>
> *     *     *     *     *     *     *
>
> (3)  The provisions of this section are subject to any third party rights provided by the law relating to realty records, and the contract for sale may be executed and recorded as a document transferring an interest in land and shall then constitute notice to third parties of the buyer's rights under the contract for sale.

Accordingly, the TEPCO and WEF coal supply contracts are contracts for the sale of goods under New Mexico law.[3]

---

[3] N.M. Stat. Ann. sec. 55-2-106(1) (Michie 1993) and sec. 2-106(1) of the Uniform Commercial Code each define a "contract for sale" to include both a present sale of goods and a contract to sell goods in the future.

Even though coal supply contracts are contracts for the sale of goods covered by article 2 of the Uniform Commercial Code, the obligation of Santa Fe or its successors to sell unsevered coal in the future may also qualify to be treated as the transfer of an interest in land.  See N.M. Stat. Ann. sec. 55-2-107(1).  In other words, classification of the two supply contracts as contracts for the sale of goods in the future by N.M. Stat. Ann. section 55-2-107(1), does not preclude those contracts from also effecting a transfer of an interest in real property under New Mexico law.  See also 1 Restatement, Contracts 2d, sec. 127, cmt. b & c (1981).

### 2.  Creation of Servitudes

The TEPCO and WEF coal supply contracts created servitudes under New Mexico law.  The modern view is that servitudes may be created by contract.  See Cafeteria Operators, L.P. v. Coronado-Santa Fe Associates, L.P., 952 P.2d 435, 441 (N.M. Ct. App. 1997); 1 Restatement, Property 3d (Servitudes), sec. 2.1(1)(a), reporter's note (2000).

Although he disputes that the supply contracts created servitudes under New Mexico law, respondent acknowledges that the servitudes (stemming from the seller's obligation to mine and supply coal from the Lee Ranch mine property to the buyer/utility) involve affirmative covenants.  See 1 Restatement,

Property 3d (Servitudes), sec. 1.3(1) & (2), cmt. d, illus. 1 &
2.[4]

New Mexico law recognizes both "real covenants" and
"equitable servitudes".[5] E.g., Pollock v. Ramirez, 870 P.2d 149,
153 (N.M. Ct. App. 1994). In Pollock, a restrictive covenant was
not enforceable because the instrument creating it did not meet
the requirements for recordation in real property records. The
court in Pollock, however, noted that the restriction could still
be enforced as an equitable servitude assuming the requirements
for establishing and enforcing such an equitable servitude were
met. See id. at 153.

Under New Mexico law, there are three requirements for a
covenant to be an equitable servitude: (1) The covenant must
touch and concern the land; (2) the original "covenanting"

_____

[4]Vol. 1 Restatement, Property 3d (Servitudes), sec. 1.1
(2000) defines a "servitude" as a legal device that creates a
right or an obligation that runs with land or an interest in
land. "Running with land" means that the right or obligation
passes automatically to successive owners or occupiers of the
land or the interest in land with which the right or obligation
runs. Id. sec. 1.1(1)(a). Servitudes covered by the Restatement
include easements, profits, and covenants. Id. sec. 1.1(2). As
defined by the Restatement, an "easement" creates a nonpossessory
right to enter and use land in the possession of another and
obligates the possessor not to interfere with the uses authorized
by the easement, whereas a "profit" is an easement that confers
the right to enter and remove timber, minerals, oil, gas, game,
or other substances from land in possession of another. Id. sec.
1.2(1) & (2).

[5]Vol. 1 Restatement, supra sec. 1.4 has dropped the terms
"real covenant" and "equitable servitude" to describe servitudes
encompassed within covenants that run with the land.

parties must intend that covenant to run with the land; and (3) any successor against whom enforcement is sought must have actual, constructive, or inquiry notice of that covenant. Lex Pro Corp. v. Snyder Enters., Inc., 671 P.2d 637, 639 (N.M. 1983); Pollock v. Ramirez, supra at 153.

In Lex Pro Corp. v. Snyder Enters., Inc., 100 N.M. at 391, the New Mexico Supreme Court observed that a covenant touches and concerns the land if either (1) the burden of that covenant renders the covenantor's interest in land less valuable or (2) the benefit of that covenant renders the covenantee's interest in land more valuable. The New Mexico courts have also held that a covenant meets the "touch and concern" requirement if it calls for either doing physical things to the land such as building a wall, or refraining from doing physical things to the land. Cypress Gardens, Ltd. v. Platt, 952 P.2d 467, 470 (N.M. Ct. App. 1997). The TEPCO and WEF supply contract obligations of Santa Fe and its successors to mine and supply coal from the Lee Ranch mine property do touch and concern that land.[6]

As to the second requirement that the original covenanting parties intend that the covenant run with the land, the WEF supply contract specifically expresses an intent to effect a

---

[6]Although 1 Restatement, supra sec. 3.2, now requires neither the benefit nor the burden of a covenant to touch and concern land in order for the covenant to be valid as a servitude, we need not here decide whether this requirement has been superseded under New Mexico law.

dedication of the Lee Ranch mine coal reserves to fulfilling that contract and to establish a servitude upon Santa Fe and its successors running with the Lee Ranch mine property. Although the TEPCO supply contract contains no specific provision, it provides that the agreement is to inure to the benefit of and be binding upon respective successors to and assigns of the original parties to the TEPCO contract. Where the original instrument creating a covenant involving land provided that successors should be bound by the covenant and where only successive owners of the land were capable of performing the obligation pertaining to that covenant, that covenant has been held to run with the land. Murphy v. Kerr, 5 F.2d 908, 910 (8th Cir. 1925); Bolles v. Pecos Irr. Co., 167 P. 280, 282-283 (N.M. 1917).[7]

As to the requirement that the successor against whom enforcement of that covenant is sought have actual, constructive, or inquiry notice, Peabody had actual notice of the TEPCO and WEF coal supply contract obligations, as it assumed those contracts. In addition, a memorandum of dedication concerning the WEF contract was recorded in 1985 with the County Clerk for McKinley County, New Mexico, the county in which the Lee Ranch mine is

---

[7]See also 1 Restatement, supra sec. 2.2, cmt. i ("If the contract calls for a performance that can only be rendered by someone who owns or occupies a particular parcel of land, and if it would have little value to the other party if it could be terminated by a conveyance of that land, the burden was probably intended to run with the land of the promisor.").

located.

We hold that the TEPCO and WEF coal supply contracts created servitudes obligating Santa Fe and successive owners of the Lee Ranch mine to mine and supply coal to the buyer/utility and that those servitudes are real property interests under New Mexico law.  See 1 Restatement, Property 3d (Servitudes), sec. 2.1 cmt. b, illus. 4.

II.  Like-Kind Status of the Supply Contracts Under Section 1031

A.  Petitioner's Arguments

Petitioner contends that the real property status of the supply contracts under New Mexico law should be determinative of the like-kind issue; i.e., should automatically qualify the contracts as like-kind property to the gold mining property under section 1031(a).  In support of this argument, petitioner, among other things, relies on this Court's holding in Or. Lumber Co. v. Commissioner, 20 T.C. 192, 196-197 (1953).  Petitioner notes that this Court held in Or. Lumber Co. that the rights to harvest standing timber were personal property under Oregon law and therefore were not like-kind property to land (real property) received in exchange.

If the status of the supply contracts as real property is held not in and of itself to be dispositive, petitioner alternatively argues the supply contracts are like-kind property to the gold mining property because the contracts (including

potential renewals) could have a duration or term lasting 30 or more years.  Petitioner's argument is based on section 1.1031(a)-1(c), Income Tax Regs., which provides a safe harbor for a 30-year or greater leasehold of a fee to qualify as "like kind" to a fee interest in real property.

Finally, petitioner places reliance in Koch v. Commissioner, 71 T.C. 54, 65-70 (1978), a case which petitioner contends is indistinguishable from the circumstances we consider here.  In that case, this Court held that two parcels of fee simple real property were like kind, under section 1031(a), even though one parcel was subject to 99-year condominium leases.  In Koch, it was reasoned that the leases did not constitute boot because they were not separable from the fee simple real property interest.

B.  Respondent's Arguments

Conversely, respondent contends that the fact that the supply contracts are treated as real property interests under New Mexico law does not conclusively establish that they are like kind to the gold mining property Peabody transferred.  Respondent argues that like kind status of the supply contracts, for purposes of section 1031, is a question of Federal tax law. Respondent also notes that section 1031 case precedent does not support the axiom that exchanges of real property are ipso facto like kind.  On this point, see Koch v. Commissioner, supra at 64-65 (citing Fleming v. Commissioner, 24 T.C. 818, 823-824 (1955),

affd. in part and revd. in part 241 F.2d 78 (5th Cir. 1957), affd. sub nom. Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958)). Respondent contends that the supply contracts constitute property of a different kind and class and are not like-kind property to the gold mining property Peabody transferred, because the contracts are of an intrinsically different nature and character from gold mining property. See sec. 1.1031(a)-1(b), Income Tax Regs.

Finally, respondent argues that Koch is distinguishable from and inapplicable to this case because the condominium leases in Koch were 99-year (long-term) land leases, whereas the coal supply contracts we consider are only interests in coal to be removed from the ground.[8] Respondent also attempts to distinguish Koch, where condominium leaseholders had the primary right directly to use the land, from this case, where the coal buyers have no direct and substantially similar right to use the Lee Ranch mine land.

C. Analysis

We agree with respondent that exchanges of real property interests are not, ipso facto, like-kind exchanges under section 1031. Koch v. Commissioner, supra at 64-65; see also Smalley v.

---

[8]We note that respondent does not carry this reasoning into the question of whether the Lee Ranch mine (land in fee and coal leases) is like-kind property to the two gold mine properties received in exchange.

Commissioner, 116 T.C. 450, 463-464 (2001). For example, carved-out oil payments, although characterized as real property under State law, were found not to be like kind to a fee interest in real estate. Fleming v. Commissioner, supra at 823-824. See also Wiechens v. United States, 228 F. Supp. 2d 1080, 1085 (D. Ariz. 2002), where 50-year water rights were not like kind to a fee interest in real estate, and Clemente, Inc. v. Commissioner, T.C. Memo. 1985-367, where an 8-acre parcel of land was not like kind to gravel extraction rights in another parcel of land.

To decide whether an exchange is like kind within the meaning of section 1031(a), we must compare the exchanged properties to ascertain whether the nature and character of the transferred rights in and to the respective properties are substantially alike. Koch v. Commissioner, supra at 64-65; sec. 1.1031(a)-1(b), Income Tax Regs. See generally the discussion in Smalley v. Commissioner, supra at 461-464. We conclude that the real property interest status under New Mexico law of the TEPCO and WEF supply contracts is not determinative of whether those supply contracts constitute like-kind property as opposed to boot under section 1031. See Koch v. Commissioner, supra at 64-65. In making this comparison, consideration is to be given to the respective interests in the physical properties, the nature of the title conveyed, the rights of the parties, the duration of the interests, and any other factor bearing on the nature or

character of the properties as distinguished from their grade or quality. Id.; sec. 1.1031(a)-1(b), Income Tax Regs.

In Commissioner v. Crichton, 122 F.2d 181, 182 (5th Cir. 1941), affg. 42 B.T.A. 490 (1940), the Court of Appeals for the Fifth Circuit held that the exchange of an overriding royalty interest in minerals for a city lot qualified as a like-kind exchange. See also Rev. Rul 68-331, 1968-1 C.B. 352, in which it was ruled that the exchange of an oil producing lease for a fee simple title to a ranch qualified as a like-kind exchange.

Conversely, in Fleming v. Commissioner, 24 T.C. at 823-824, we held that the exchange of an assignment of carved-out oil payment rights for a fee interest in real estate failed to qualify because they were not like-kind properties, even though applicable State law characterized the oil payment rights as an interest in real estate.

In Koch v. Commissioner, 71 T.C. at 65, we reconciled the difference in the holdings of Crichton and Fleming as follows:

> The main distinction between the two transactions is the duration of the interests--an overriding royalty interest continues until the mineral deposit is exhausted whereas a carved-out oil payment right terminates usually when a specified quantity of minerals has been produced or a stated amount of proceeds from the sale of minerals has been received.

Petitioner attempts to distinguish the coal supply contracts here from the carved-out production payment rights in Fleming, on the basis that the supply contracts are more extensive in scope

and duration.  Petitioner argues that the contracts involve "essentially perpetual and unlimited rights" and meet the 30-year-leasehold safe harbor of section 1.1031(a)-1(c), Income Tax Regs., because each contract, with renewals, had 30 or more years to run at the time of the exchange.

Peabody's right to mine and extract coal from the Lee Ranch mine land derives solely from its ownership of the land in fee and the coal leases making up that coal mine property, not from the TEPCO and WEF contracts.  As previously discussed, the supply contracts created servitudes obligating Peabody to mine and supply coal from the Lee Ranch mine to the utility/buyers pursuant to those contracts.  Those contracts themselves, however, did not give Peabody the right to mine coal from the Lee Ranch land.

The supply contracts obligate each utility/buyer to pay a specified price for Lee Ranch mine coal.  In other words, the contracts afford Peabody specified payment rights with respect to the coal supplied.  In that respect, Peabody's supply contract payment rights are incident to, derive almost exclusively from, and cannot be separated from its ownership of the Lee Ranch mine land.  It is Peabody's ownership of that mine's coal reserves that gives Peabody the right to mine and extract coal from the

Lee Ranch mine land.[9]  In addition, unlike the overriding royalty interests in <u>Crichton</u>, Peabody's supply contract payment rights do not necessarily last until coal on the Lee Ranch mine land has been exhausted.  Without optional renewals, the TEPCO supply contract lasts until December 31, 2009, and the WEF supply contract lasts until December 31, 2004.  See, e.g., <u>Clemente v. Commissioner</u>, T.C. Memo. 1985-367, where exchanged properties were held not to be like kind because the gravel extraction right the taxpayer received did not give that taxpayer the right to an unlimited quantity of gravel.  By contrast, in Rev. Rul. 55-749, 1955-2 C.B. 295, the exchange of fee land for perpetual water rights was ruled to be qualified as like kind.[10]

---

[9]In his declaration, the Lee Ranch mine's controller stated that, to the best of his knowledge, all coal ever supplied under the TEPCO and WEF supply contracts has come from the Lee Ranch mine.  In certain limited and/or remote circumstances, each contract would permit the seller to furnish substitute coal from a source other than the Lee Ranch mine.  For instance, the seller under the TEPCO contract commits to use its best efforts to mine and supply to TEPCO such coal as is needed for operation of the Springerville Station from the Lee Ranch mine's coal reserves. The TEPCO contract, however, provides that from "time to time", the seller may substitute coal from other mines owned by the seller so long as the substituted coal delivered satisfies prescribed quality requirements and does not cost more than coal then being delivered to the Springerville Station from the Lee Ranch mine.  Similarly, during an event of force majeure, the WEF supply contract would permit the seller, with the buyer's consent, to deliver substitute coal (i.e., coal obtained from a source other than the Lee Ranch mine) to the Escalante Station.

[10]In Rev. Rul. 55-749, 1955-2 C.B. 295, 296, the rationale for the ruling included the following:

(continued...)

However, Peabody seeks to come within the safe harbor of section 1.1031(a)-1(c), Income Tax Regs., by relying on the renewal terms of the supply contract that might cause the contracts to last 30 years or more.[11]  In Century Elec. Co. v. Commissioner, 15 T.C. 581, 591-592 (1950), affd. 192 F.2d 155 (8th Cir. 1951), we indicated that subsequent 10-year periods were added to the initial term of a 25-year lease to meet the requirements of a leasehold for 30 years or more under the Treasury regulation safe harbor.  See also Rev. Rul. 78-72, 1978-1 C.B. 258, which would allow the addition of optional renewal periods to determine if a leasehold interest was for 30 years or more.

---

[10](...continued)
where the water right, whatever its size, is in perpetuity, as distinguished from a right to a specific total amount of water or to a specific  amount of water for a limited period, the water rights and the land involved are regarded as sufficiently similar to constitute property of a like kind within the meaning of section 1031(a) of the Code. * * *

[11]We previously have indicated that a short-term leasehold of real property is not equivalent to a fee interest for purposes of sec. 1031.  Capri, Inc. v. Commissioner, 65 T.C. 162, 181-182 (1975); May Dept. Stores Co. v. Commissioner, 16 T.C. 547, 556 (1951); Standard Envelope Manufacturing Co. v. Commissioner, 15 T.C. 41, 48 (1950).  As we observed in Smalley v. Commissioner, 116 T.C. 450, 464 n.11 (2001), this characterization of short-term leasehold interests derives not from any particular State law characterization but from negative implication of longstanding regulations which provide that an exchange of a 30-year lease for a fee interest qualifies as a like-kind exchange under sec. 1031.

Contrary to petitioner's argument, the supply contract payment rights are not a leasehold interest in a fee property. As previously held, Peabody's right to mine and extract coal from that land comes solely from ownership of the coal mine. We therefore conclude that the 30-year safe harbor provisions of section 1.1031(a)-1(c), Income Tax Regs., do not apply. See Wiechens v. United States, 228 F. Supp. 2d at 1085 (where it was held that a taxpayer's 50-year water rights were not equivalent to a leasehold of a fee for 30 years or more so as to qualify for the regulation safe harbor).

The underlying rationale for allowing nonrecognition of gain or loss under section 1031 is the concept that a taxpayer's economic situation following the exchange is essentially the same as it had been before the transaction. This is expressed in the following quote from the committee report underlying the predecessor statute to section 1031: "if the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested, he is not allowed to compute and deduct his theoretical loss on the exchange, nor is he charged with a tax upon his theoretical profit". H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939-1 C.B. (Part 2) 554, 564; see also Biggs v. Commissioner, 69 T.C. 905, 913 (1978), affd. 632 F.2d 1171 (5th Cir. 1980). The underpinning supporting section 1031(a) is that the new property is substantially a continuation of the old

investment which remains unliquidated. <u>Commissioner v. P.G. Lake, Inc.</u>, 356 U.S. at 268.

In determining whether the like-kind requirement of section 1031 had been met, we found it significant in <u>Koch v. Commissioner</u>, 71 T.C. at 65, that section 1031(a) refers to property of a like, not an identical, kind. The required comparison of the old and new exchanged properties, we reasoned, should be directed to whether the taxpayer, in making the exchange, has used its property to acquire a new kind of asset or has merely exchanged its property for an asset of like nature or character. <u>Id.</u> Examining the exchanged properties in <u>Koch</u> with those principles in mind, we held the taxpayer's exchange of fee simple land for other fee simple land subject to 99-year condominium leases qualified for nonrecognition treatment under section 1031(a) because those exchanged properties were property of a like kind. <u>Id.</u> at 65-70.

In <u>Koch</u>, we rejected the Commissioner's contention that the taxpayer/lessor's interests (primarily the right to condominium rental payments) could be separated from the taxpayer's fee simple interest in that land. We observed that: (1) The taxpayer's right to rent was not a separate and distinct item of property but part of the bundle of rights incident to ownership of the fee; (2) the bundle of rights and its related obligations were inextricably bound up with the fee simple interest; (3) the

condominium leases contained numerous provisions (some of which we briefly summarized in our findings in <u>Koch</u>) not only securing the payment of rent but also protecting the value of the taxpayer's reversionary interest; and (4) the right to rent was merely an incident of ownership of the fee simple interest. <u>Id.</u> at 66-68. We also acknowledged that the 99-year condominium leases prevented the taxpayer from taking physical possession of the land received and using it for other purposes. We viewed that leasehold restriction on the taxpayer's use of the new land as a distinction in the grade or quality of the exchanged old and new properties as opposed to a difference in their kind or class. We observed that section 1031(a) "'was not intended to draw any distinction between parcels of real property however dissimilar they may be in location, in attributes, and in capacities for profitable use.'" <u>Koch v. Commissioner</u>, 71 T.C. at 68 (quoting <u>Commissioner v. Crichton</u>, 122 F.2d at 182).[12] Finally, in <u>Koch v. Commissioner</u>, <u>supra</u> at 70, we held that the value of the taxpayer's condominium lease interests did not constitute taxable

---

[12]Sec. 1.1031(a)-1(b), Income Tax Regs., contains the explanation that the "like-kind" requirement concerns the nature or character of property and not its grade or quality. As we observed in <u>Commissioner v. Crichton</u>, 42 B.T.A. 490, 492 (1940), affd. 122 F.2d 181 (5th Cir. 1941), substantially similar interpretations of the term "like kind" have appeared in all applicable regulations beginning with those issued under the Revenue Act of 1921.

other property or boot under section 1031(b), because the "lessor's fee simple interest cannot be so fragmented."

In return for the gold mining property Peabody, among other things, received the Lee Ranch coal mine, which was subject to two coal supply contracts. Respondent acknowledges that the Lee Ranch mine (consisting of fee simple land and coal leases) is like kind to the gold mining property and qualifies for nonrecognition treatment under section 1031(a).[13] Respondent, however, contends this case is distinguishable from Koch. Respondent argues that the coal supply contracts are separable from the Lee Ranch mine and constitute taxable other property or boot under section 1031(b). In other words, respondent argues those two supply contracts can be fragmented and are not inextricably bound up with Peabody's ownership of the Lee Ranch mine's coal reserves. We disagree.

Although each supply contract is also a contract for the sale of goods under New Mexico law and does not give the utility/buyer a right to extract coal from the Lee Ranch mine land, in the context of this case we do not find those distinctions to be significant nor to sufficiently distinguish this case from Koch. Peabody's right to mine and extract coal

---

[13]Apparently, respondent does not dispute that the exchange of leasehold for fee interest here is all right. In addition Peabody's right to mine and extract coal from the Lee Ranch mine is obviously substantially alike to the right to mine and extract gold from the two gold mines.

from the Lee Ranch mine land and its supply contracts payment rights for the coal cannot be separated from its ownership of the Lee Ranch mine coal reserves. Those rights are part of the bundle of rights incident to Peabody's ownership of the Lee Ranch mine land coal reserves. Indeed, those supply contracts give Peabody no right to mine and extract coal from that land. Instead, Peabody's right to mine and extract coal from that land comes solely from its ownership of that land and coal reserves.

As to the right to payment under the contracts for coal furnished, those rights are ancillary to Peabody's ownership of the coal reserves. Accordingly, the question of whether the supply contracts afford an advantageous or detrimental coal price to Peabody is immaterial in that setting. See Koch v. Commissioner, 71 T.C. at 68. Because we hold that the right to receive income from the tenant is part of the bundle of rights ancillary to and inherent in the ownership of the realty, the question of whether the lease was advantageous or detrimental to the fee owner is immaterial.

It is true Peabody is obligated to mine and supply coal to meet the operating needs of power stations and that Peabody is prohibited from impairing the contracted-for supply by selling coal to other buyers. In our view those contract obligations and restrictions constitute a distinction in the grade or quality of the old and new mining properties rather than a difference in

their kind or class.  The new coal mine property is of a like nature or character to the gold mining property Peabody exchanged.  By exchanging the gold mining property for the coal mining property subject to the supply contracts, Peabody is essentially continuing the original investment which remains fully unliquidated.  See Commissioner v. P.G. Lake, Inc., 356 U.S. at 268.  Respondent, contrary to our holding in Koch, is attempting to fragment and currently tax Peabody on the supply contracts before their actual realization.

We hold that the coal mine subject to the TEPCO and WEF supply contracts Peabody received is like kind to the gold mining property transferred and that Peabody's exchange qualifies for nonrecognition treatment under section 1031(a).  See Koch v. Commissioner, 71 T.C. 54 (1978).  In the light of that holding and because the supply contracts cannot be separated from Peabody's ownership of the Lee Ranch mine coal reserves, it follows that those contracts are not taxable as other property or boot under section 1031(b).  See id.

D.  <u>Conclusion</u>

On the basis of the forgoing, we conclude, as a matter of law, that petitioner is entitled to summary judgment and respondent is not so entitled.

<u>An appropriate order will be issued</u>

<u>at docket Nos. 20328-04 and 6899-05.</u>

[Reporter's Note:  This Opinion was modified by Order dated July 13, 2006.]