**Affirmed and Memorandum Opinion filed August 8, 2023.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-22-00695-CV

---

### ELI SASSON, Appellant

### V.

### WILLIAM LIPSKY AND SHARON LIPSKY, Appellees

---

**On Appeal from the 11th District Court
Harris County, Texas
Trial Court Cause No. 2018-19241**

---

## MEMORANDUM OPINION

Plaintiff-appellant Eli Sasson agreed to purchase a house owned by defendant-appellees William ("Bill") and Sharon Lipsky. A jury found that Sasson breached the agreement, and that Bill and Sharon did not breach it. Sasson challenges those findings for factual insufficiency. He also contends the trial court erroneously excluded certain evidence. We hold that the jury's findings are not against the great weight and preponderance of the evidence and that the trial court did not abuse its discretion in excluding the challenged evidence. We affirm.

## Background

Sasson owns and offers for rent a house next door to the Lipskys. Sasson and Sharon discussed the potential that Sasson might purchase the Lipskys' house, which previously flooded during prolonged rain events. The Lipskys had a flood insurance policy with the National Flood Insurance Program ("NFIP"), administered by the Federal Emergency Management Agency ("FEMA"). The City of Houston, on behalf of the Lipskys, applied for and received a FEMA Flood Mitigation Assistance grant to raise the elevation of the Lipskys' flood-prone home (the "FEMA 2015 Grant"). The city was to be responsible to pay for the elevation costs from the FEMA 2015 Grant funds up to a certain amount.

In late May 2017, Bill, Sharon, and Sasson signed a contract for the sale of the Lipskys' house to "Eli Sasson or Assignee" (the "First Contract").[1] The purchase price was $275,000. Sasson agreed to purchase the house "as is," provided that the Lipskys completed the following "repairs and treatments: Seller will transfer and fully cooperate with the BUYER to transfer the FEMA 2015 grant to the Buyer, including signing any documents required, Permits and maintain the [sic]". There is no conclusion to the sentence ending with "maintain the". The underlined portion was added to a form contract.

The parties agreed to close on or before August 31, 2017. The First Contract included the following "Special Provisions":

1. [C]losing will take place after the grant elevation permits were approved by the COH [City of Houston].
2. COH approved the permit to repair the property after the flood.

---

[1] Sasson testified that he designated "Eli Sasson or Assignee" as the buyer because he frequently assigns ownership of properties after purchase. Sasson testified that he intended to use the subject property as a rental property. Sasson never assigned the contract to a third party.

3. Buyer notified that the property was flooded in the past, and currently is approved by the City grant elevation attached to this contract.

4. Seller will maintain the FEMA flood insurance required by the Grant in order to qualify for elevating the Property. [U]pon closing or before at the Buyer option to transfer the insurance from Seller to the Buyer.

[5.] Seller and Buyer [m]ay intend to use 1031 Exchange of this transaction.[2]

Section 14, governing "Casualty Loss," provided:

If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may (a) terminate this contract and the earnest money will be refunded to Buyer[,] (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition with an assignment of insurance proceeds, if permitted by Seller's insurance carrier, and receive credit from Seller at closing in the amount of the deductible under the insurance policy.

On June 9, 2017, Bill and Sasson signed a second contract (the "Second Contract"). The terms were identical to the First Contract, except that the date for closing changed. Whereas the First Contract stated closing would occur no later than August 31, 2017, the Second Contract provided that closing would occur "after the grant elevation permits were approved by the COH." Sharon did not sign the Second Contract.

The Lipskys granted Sasson a limited power of attorney to "act[] on [the Lipskys'] behalf on FEMA 2015 Grant for all permits and constructions [sic]

---

[2] "1031 Exchange" refers to a tax-deferred, like-kind exchange pursuant to Section 1031 of the Internal Revenue Code. *See infra* Part B for more discussion.

decisions," and they gave him keys to the property. Sasson chose Arkitektura Development, Inc. as the contractor for the elevation project.

In July 2017, the Lipskys signed two additional contracts. The first was with Arkitektura, which agreed to perform the elevation work for a contract price of $197,437.08. The second was with the City of Houston, which agreed to pay Arkitektura's contract price for the elevation work from the FEMA 2015 Grant funds and that the Lipskys were not responsible for any amount of that work. The Arkitektura contract provided, however, that the Lipskys were responsible for "non-eligible items." In mid-August, Arkitektura notified the Lipskys that their homeowners' association required a fascia around the elevated house, which was not covered by the FEMA 2015 Grant and which would cost $7,864.50 to complete. Bill emailed Sasson, asking, "Do you still intend to buy the property?"

In late August 2017, Hurricane Harvey struck the Houston area and flooded the Lipskys' property. The Lipskys filed a flood insurance claim.

On September 17, 2017, Bill emailed Sasson, saying, "The contract expired 31 August 2017. If you still wish to purchase the house and property we need a new contract for the $275,000 and a payment of the $7,864.50 non-elevation costs so we can immediately pay for the city to elevate.[3] Any insurance money that may be payable because of the hurricane belongs to us." Sasson responded that he was "willing to pay [$7,864.50] to the seller at closing." He also said that he had "full intention to buy the property" and that he was "selecting sub paragraph 14C, and . . . demanding all the insurance information in order to immediately taking actions on the restorations of the damaged property with the insurance money."

---

[3] According to the relevant contracts, the Lipskys were not paying the city to elevate their house. The city was paying Arkitektura from the FEMA 2015 Grant funds.

4

The next day, Bill told Sasson that the Lipskys wanted to "close as soon as possible." The Lipskys were willing to "sign whatever assignments [Sasson] request[ed], net expenses, to assist [him] in obtaining the grant money . . . [and] assign [their] flood insurance to [Sasson], net expenses, and [Sasson could] deal with the adjuster on the damages to the house from Harvey."

A week later, Bill emailed the public adjuster hired to handle the Lipskys' flood claim, Mitchell Berg. Bill told Berg, "Sharon and I are in a quandary as to take the 275K and run for the hills or to scotch the whole deal and wait to get sued by Eli for the money that the insurance might give us. I think what bothers Sharon is that he dithered for so many months when the property could have been his and the claim his."

In October, Bill again told Sasson that the Lipskys would assign their rights under the elevation contract with the city and assign the flood policy as well, so long as Sasson agreed to a "firm closing date no later than October 18th, 2017."

Sasson responded, "I have same interest to close as soon as posible [sic], but you must help in resolving the pending contingents [sic] issues in the contract." Shortly after, Sasson sent a second response, accusing the Lipskys of delaying closing by not paying the $7,864.50 fee for the fascia, which was required to be paid before Arkitektura could secure the elevation permit from the city.[4]

Bill reiterated that the Lipskys had "fulfilled [their] part of the contract" and would assign their elevation contract rights and the flood claim, if assignable. Bill also asked the title company to schedule a closing date "on or close to 20 October 2017."

---

[4] Previously, Sasson indicated he was willing to pay this cost at closing.

On October 12, Bill paid $7,864.50 to Arkitektura for the fascia cost. Regarding assignment of the flood claim, on October 15, Bill emailed Sasson a copy of a memo he received from FEMA addressing assignability. Bill explained that FEMA authority barred the Lipskys from assigning the flood insurance *claim* to Sasson, but they could assign the *proceeds* from the claim once it settled. Bill offered to let Sasson know when the Lipskys "finally resolve[d] the claim and the amount net of [their] costs [they would] receive. Then [they would] need to follow the Federal Assignment of Claims Act requirements to assign those net proceeds to [Sasson]." Sasson responded that the "permit for the repair of the house is still need to be taking care," but that he understood that the Lipskys intended "to pay [Sasson] back the proceed from the insurance to cover the damage."

The next day, Sasson sent an email to the title company and to Bill, saying that Sasson believed the parties could "proceed to closing soon." However, they still needed to "overcome the home permit repair . . . and to conclude the post-closing agreement that will insure seller obligations to the buyer proactively pursue the insurance repair funds to be paid to the Buyer."

The City of Houston issued the elevation permit on October 18, 2017.

On October 26, Sasson's attorney sent an "assignment and cooperation agreement" to the Lipskys "to bring a resolution to the outstanding issues regarding the sale." The agreement provided that, "[i]n consideration of [Sasson's] willingness to complete the sale and accept the Property in its damaged state, [the Lipskys] hereby assign to [Sasson] all rights to recover proceeds paid under or in connection with their Flood Claim." The Lipskys did not sign the agreement. Sharon testified that she did not want to sign the assignment and cooperation agreement because she read it as requiring the Lipskys to pay Sasson the difference if the insurance proceeds were not enough to pay for the repairs.

In December, FEMA paid the Lipskys $266,611.34 for the Hurricane Harvey flood claim. A month later, the Lipskys' attorney sent a letter to Sasson's attorney, stating:

> The Lipskys are not interested in trying to reach an agreement with Mr. Sasson. As you know, Sharon Lipsky never signed either contract written and presented by Mr. Sasson. I understand she never saw the second contract. Regardless, to the extent there was or is a contract between with Mr. Sasson it is terminated.
>
> By this letter the title company is being notified of the termination. My client agrees to a return of Mr. Sasson's earnest money to him and if the title company provides a release it will be signed.

Arkitektura completed the elevation work in April 2018. As of trial in May 2022, the Lipskys had not repaired the flood damage to the home.

Sasson sued the Lipskys for breach of contract for refusing to restore the property to its pre-Harvey condition, for failing to assign the insurance claim to Sasson, and for refusing to close the sale. The Lipskys answered, arguing that the Second Contract was not valid because Sharon did not sign it and because the parties did not reach a meeting of the minds regarding the $7,864.50 payment to Arkitektura. The Lipskys also asserted a counterclaim for declaratory judgment, requesting a declaration that Sasson breached the Second Contract and seeking an award of the $5,000 earnest money held in escrow by the title company.

The case was tried to a jury, which found that Bill and Sharon agreed to sell their property to Sasson and Sasson agreed to purchase it (questions 1 and 2); that neither Bill nor Sharon failed to comply with the contract (questions 3 and 4); and that Sasson failed to comply with the contract (questions 5 and 6).

The trial court signed a judgment in accordance with the jury's findings, awarding the Lipskys $5,000. Sasson appeals.

**Analysis**

## A. Breach

In his second issue, Sasson argues that the jury's breach of contract findings—that Sasson failed to comply and that the Lipskys did not fail to comply—are not supported by factually sufficient evidence. When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the finding. *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When a party attacks the factual sufficiency of an adverse finding on an issue on which it had the burden of proof, the party must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). When a party attacks the factual sufficiency of an adverse finding on which it did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.). We consider all the evidence, but we will not reverse the judgment unless "the evidence which supports the [] finding is so weak as to [make the finding] clearly wrong and manifestly unjust." *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

We apply these standards mindful that this court is not a fact finder. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The trier of fact is the sole judge of witnesses' credibility and the weight afforded their

8

testimony. *GTE Mobilnet*, 61 S.W.3d at 615-16. Therefore, we may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder, even if the evidence would also support a different result. *Id.*

The essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.). "A breach [of contract] occurs when a party fails or refuses to do something he has promised to do." *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). On appeal, Sasson challenges the jury's findings that the Lipskys complied with the contract (a negative finding on element 3 of his breach claim) and that Sasson did not comply with the contract (either a negative finding on element 2 of Sasson's affirmative claim or an affirmative finding on element 3 of the Lipskys' counterclaim).[5]

1.    The findings that the Lipskys did not fail to comply

We begin with the jury's findings that neither Bill nor Sharon breached the contract. One of the Lipskys' obligations was to transfer or assign to Sasson the FEMA 2015 Grant to elevate the house. The jury heard testimony and received evidence that the Lipskys tendered performance in compliance with the contract by offering to assign the elevation permit. Additionally, the Lipskys signed a power of attorney in Sasson's favor, gave him the keys to the property, entered into an agreement with a contractor of Sasson's choosing to perform the elevation work,

---

[5] Ultimately, which party bore the burden of proof on the issue of Sasson's compliance is not material to our disposition.

and stated more than once their willingness to sign all assignments necessary to complete the elevation work.

Sasson insisted that the Lipskys also needed to obtain a "home repair permit," separate from the elevation permit. Sasson offered to pay the home repair permit cost but said that the Lipskys must "cooperate in signing the papers" needed "to issue the home repair permit." We see nothing in the contract requiring the Lipskys to obtain a home repair permit as a prerequisite to closing. The contract required the Lipskys to "transfer and fully cooperate with [Sasson] to transfer the FEMA 2015 grant to [Sasson], including signing any documents required [and] Permits." This provision relates only to the elevation grant, not to any home repair permit.

The contract required the Lipskys to "complete all agreed repairs and treatments prior to the Closing Date; and [to obtain] required permits." There is no evidence that the Lipskys and Sasson agreed that the Lipskys would repair the home prior to the closing date; indeed, Bill testified that it was not possible to repair the home until the elevation work was completed, which did not occur until April 2018. Thus, the jury was free to discount Sasson's evidence that the Lipskys breached the contract by not obtaining a home repair permit.

The contract also required the Lipskys to maintain flood insurance. Also, Section 14 of the contract governed circumstances in which the property was damaged by casualty before closing. If the Lipskys failed to restore the property by the closing date due to factors beyond their control, then Sasson's options were to terminate the contract, extend the closing date by fifteen days, or accept the property as-is along with an assignment of insurance proceeds, if permitted by the Lipskys' insurance carrier. After Hurricane Harvey damaged the Lipskys' house, Sasson informed the Lipskys that he was choosing the third option—receiving the

10

property as-is, along with an assignment of insurance proceeds if permitted by NFIP/FEMA. The jury heard evidence that the Lipskys complied with these provisions by maintaining flood insurance and offering to assign to Sasson the insurance proceeds from the Hurricane Harvey claim.

The parties dispute whether the Lipskys could assign the insurance claim before it was finalized. The Lipskys contend that the Federal Assignment of Claims Act permits an assignment of an insured's claim against the United States to a third party only after the insured's claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. *See* 31 U.S.C. § 3727(b).[6] Further, the Lipskys gave Sasson a memo from the Assistant Administrator for Federal Insurance to Write Your Own Company Principal Coordinators and the NFIP Direct Servicing Agent regarding Inclusion of Law Firms on Checks Arising Out of NFIP Claims. In the memo, the administrator stated that the manner in which a flood insurance claim payment is issued, including the payees on a check, "is governed exclusively by applicable federal laws and regulation, and the terms of the Standard Flood Insurance Policy (SFIP)." Each SFIP defines "insured" to include "any mortgagee and loss payee named in the Application and Declarations Page, as well as any other mortgagee or loss payee determined to exist at the time of the loss in the order of precedence." At

---

[6] Section 3727, which governs assignment of claims against the United States Government, provides:

> An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

31 U.S.C. § 3727(b).

11

various points in September and October 2017, the Lipskys relied on this memo to argue that they could not assign the claim to Sasson.

Sasson argues that this authority only barred assignments with third parties such as claimants' attorneys or public adjusters "whose interest did not exist at the time of the loss," and did not bar an assignment to purchasers like Sasson with a property under contract at the time of the loss. Regardless of the assignability of the Lipskys' insurance *claim*, in the event of a casualty loss the contract only required the Lipskys to assign the "insurance *proceeds*, if permitted by [their] insurance carrier." (Emphasis added). The Lipskys tendered performance in this respect by expressly offering, in an October 15 email, to "assign the proceeds from the claim once [the Lipskys] settle[d] the claim." At trial, the Lipskys' attorney asked Sasson: "They offered to assign those proceeds to you if you would come close?"; "And they offered to assign to you the grant contracts with Arkitektura and the City of Houston, right?"; and "And that was all they needed to do to comply with the contract, correct?" To these questions, Sasson answered, "Yes."

Sasson contends nonetheless that the Lipskys did not comply with Paragraph 14 of the contract because, after Hurricane Harvey, the Lipskys considered taking the $275,000 in purchase money and "run[ning] for the hills." Sasson also testified that, once the Lipskys received the flood insurance money in December 2017, they were obligated to assign him the proceeds. Although it is true that Bill considered "run[ning] for the hills" in September 2017, there was also evidence that the Lipskys offered to assign Sasson the insurance proceeds in October 2017, long before the claim was paid. The jury reasonably may have found that by the time the flood claim was paid in December 2017, Sasson had waited unreasonably long to complete closing and that Sasson was already in breach. It was within the jury's province to resolve any conflicts in the evidence. *See Golden Eagle Archery, Inc.*

*v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (jury remains sole judge of witnesses' credibility and weight to be given their testimony).

After considering all the evidence both in favor of and contrary to the challenged findings, we conclude that the jury's findings that Bill and Sharon did not breach the contract are not against the great weight and preponderance of the evidence. *See, e.g.*, *Tillison v. Bailey*, No. 06-05-00071-CV, 2006 WL 1445611, at *3 (Tex. App.—Texarkana May 26, 2006, no pet.) (mem. op.) (evidence was factually sufficient to support finding that Bailey fulfilled his contractual obligation).

### 2. The findings that Sasson failed to comply

We next consider the jury's findings that Sasson failed to comply with his contractual duties. Principally, Sasson's duties were to pay $275,000 at closing, which was to occur, at the latest, within a reasonable time after the elevation permits were issued on October 18, 2017.

Based on the evidence, the jury may have reasonably found that Sasson failed to perform as promised. The Lipskys' attorney asked Sasson, "The permit to elevate the house was issued on October 18th, 2017, was it not?" and "And that's the date you agreed to in your contract, that date or shortly thereafter, to close; is that right?" To both questions, Sasson answered, "Yes." The jury was instructed that "compliance with an agreement must occur within a reasonable time under the circumstances unless the parties agree that compliance must occur within a specified time and the parties intended compliance within such time to be an essential part of the agreement." The agreement does not state that the deadline for closing is of the essence, and the jury reasonably could have found that Sasson simply refused to close within a reasonable time under the circumstances.

Sasson contends that he was "consistently willing and actively trying to close the sale in accordance with the terms of the contract." By example, he points to his testimony that he agreed to pay the $7,864.50 fee to Arkitektura, even though he alleges that it was not his responsibility to do so, and to the evidence that he accepted a power of attorney from the Lipskys so that he could work directly with the City of Houston to finalize the elevation issues. However, as discussed above, the jury also heard evidence that Sasson refused to close unless and until the Lipskys obtained an additional "home repair" permit not required under the contract. It was the jury's prerogative as fact finder to determine witness credibility and to resolve any inconsistencies in the Lipskys' and Sasson's respective versions of events.

The jury also reasonably could have found that Sasson breached his contractual duty to accept the property as-is with an assignment of insurance proceeds because he refused to accept the offered assignment of insurance proceeds. *See B&W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (jury could have reasonably concluded that the Beckmans breached the contract by not paying the third draw); *Long Island Vill. Owners Ass'n, Inc. v. Berry*, No. 13-14-00363-CV, 2016 WL 1072856, at *9 (Tex. App.—Corpus Christi Mar. 17, 2016, pet. denied) (mem. op.) (even assuming that Long Island had no duty to dredge the canals to their original depth, the jury could have reasonably found that by not dredging the canals at all, or by acting to postpone the project, Long Island breached its contractual duty to reasonably maintain the canals by failing to dredge the canals).

After reviewing all of the evidence in the record, we conclude that the jury's finding that Sasson failed to comply with the contract is neither against the great weight and preponderance of the evidence nor so contrary to the overwhelming

weight of the evidence as to be clearly wrong and unjust. We overrule Sasson's second issue.

## B.  Exclusion of Evidence

In his first issue, Sasson argues that the trial court erred in excluding evidence regarding certain tax-deferred monies that he purportedly wanted to use to fund the purchase of the Lipskys' home. We review a trial court's ruling excluding evidence for an abuse of discretion. *Elizondo v. Krist*, 338 S.W.3d 17, 21 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 415 S.W.3d 259 (Tex. 2013). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We will uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling, even if that ground was not raised in the trial court. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Merrill v. Sprint Waste Servs. LP*, 527 S.W.3d 663, 669 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Therefore, we examine all bases for the trial court's decision that are suggested by the record or urged by the parties. *Merrill*, 527 S.W.3d at 669.

Internal Revenue Code Section 1031 provides that "[n]o gain or loss shall be recognized on the exchange of real property held for productive use in a trade or business or for investment if such real property is exchanged solely for real property of like kind which is to be held either for productive use in a trade or business or for investment." 26 U.S.C. § 1031(a)(1). "Under Section 1031 of the U.S. Internal Revenue Code, a seller of real property may avoid capital gains tax by exchanging the sold property for a property of 'like-kind' within 180 days of the sale." *Tukua Invs., LLC v. Spenst*, 413 S.W.3d 786, 792 n.2 (Tex. App.—El Paso 2013, pet. denied). Section 1031 requires an identity between the taxpayer

commencing an exchange and the taxpayer completing it. *See, e.g.*, *Chase v. Comm'r*, 92 T.C. 874, 881 (1989).

Sasson sought to admit evidence of his intention to use Section 1031 exchange funds to purchase the Lipskys' house and that he incurred a substantial tax liability because he was unable to complete the Section 1031 exchange. Prior to trial, the Lipskys filed a motion in limine regarding Sasson's Section 1031 evidence, and the trial court indicated that Sasson "needed to produce tax records which showed [he] actually suffered some damage or loss." In response, Sasson produced a tax return for Far East Land, Ltd. The general partner of Far East was a limited liability company, in which Sasson's three adult children were the only members, and the limited partners of Far East were Sasson's three children. On the day trial began, the court held a pretrial conference about Sasson's Section 1031 evidence. The Lipskys argued that the Section 1031 evidence should not be admitted because Sasson individually (rather than Far East or his three children) did not suffer any damage from a failed exchange.

The trial judge asked Sasson to establish the relevance of the Section 1031 evidence. Sasson's attorney argued that "if the contract had been assigned, . . . there could be some relevance." The judge responded that the contract was not, in fact, assigned to Far East and asked how the evidence showed Sasson's loss. Sasson's attorney said, "If the contract had happened, [Sasson] could have assigned the contract." The court suggested that was a hypothetical occurrence and stated, "that's speculative damages that we're not going to go into." The court pointed out that "[Sasson's] children are not parties to the contract, nor to this lawsuit, nor is [Far East]." The judge continued, "[Sasson] is the party to the contract. He did not assign the contract therefore his assignee is not a party to the contract." Sasson also urged an alternative reason why the Section 1031 evidence

was relevant, namely because it showed that Sasson had the incentive to close the deal. The judge rejected all of Sasson's arguments and excluded Sasson's Section 1031 evidence.

The court then commenced trial, with Sasson testifying. On the second day of trial, prior to the jury entering the courtroom, Sasson presented an assignment dated that day and signed by Sasson's three children assigning any right, title, and interest in any claim related to any tax benefits that they did not receive or to any taxes that they paid due to the "Far East Land, Ltd.'s 2017 1031 exchange and/or the attempted purchase of the Lipsky home." Sasson offered the assignment into evidence, but the trial court excluded the assignment.

On appeal, Sasson argues that the excluded evidence showed that he wanted to close the deal and thus he intended to perform. As Sasson puts it, the Lipskys "knew that the Section 1031 exchange was critically important and that Sasson was desperate to close the sale. However, as a result of the trial court's exclusion of key corroborating documentary evidence, Sasson was not allowed to make that case to the jury in its most persuasive form, and the jury was misled by the Lipskys' false impression."

We are not persuaded that the trial court abused its discretion by excluding the challenged evidence. The taxpayer that initiated the Section 1031 exchange was Far East. At all relevant times, Far East was not a party to the contract or to this lawsuit. Transactions between a party and a nonparty are generally not relevant to the alleged contract between the contracting parties. *See, e.g.*, *Gruss v. Cummins*, 329 S.W.2d 496, 502 (Tex. App.—El Paso 1959, writ ref'd n.r.e.) (telegrams and other documents between appellee and another party not admissible to show agreement between appellant and appellee as to overriding royalty

17

interest). We hold that the trial court did not abuse its discretion in excluding Sasson's Section 1031 evidence as irrelevant or speculative.

We also are not persuaded that the exclusion of the Section 1031 evidence created a false impression concerning Sasson's intent or desire to perform that ultimately harmed him. Sasson characterizes the trial as a "'he said, she said' disagreement about whose fault it was that the house sale never closed." But even if we were to assume the evidence was relevant for that reason, an error in the exclusion of evidence is not reversible unless it is controlling on a material issue, not cumulative, and probably caused the rendition of an improper judgment. *See Gunn v. McCoy*, 489 S.W.3d 75, 111 (Tex. App.—Houston [14th Dist.] 2017), *aff'd*, 554 S.W.3d 645 (Tex. 2018); Tex. R. App. P. 44.1. Here, even without the Section 1031 evidence, there was ample evidence the jury could have believed demonstrating Sasson's "same interest to close" as soon as possible, including multiple emails to Bill urging the Lipskys to "resolv[e] the pending contingents [sic] issues in the contract." Thus, the Section 1031 evidence was cumulative of other evidence contained in the admitted emails and testimony.

Moreover, we determine that the excluded evidence was not controlling on a material issue and the court's exclusionary ruling did not lead to an improper judgment. This is mainly because, to prevail on his breach of contract claim, Sasson had to prove that he performed or tendered performance. *See Grynberg v. Grey Wolf Drilling Co., L.P.*, 296 S.W.3d 132, 136 (Tex. App.—Houston [14th Dist.] 2009, no pet.). A showing that he merely *intended* to perform—no matter how fervently he may have desired to do so—is not sufficient to prove this element. *Accord, e.g., Marx v. FDP, LP*, 474 S.W.3d 368, 374 (Tex. App.—San Antonio 2015, pet. denied) ("In the context of a real estate contract, compliance

18

with all terms of the contract means that the buyer of land who is seeking specific performance must prove an actual tender of the purchase price.").

We overrule Sasson's first issue.

## Conclusion

We affirm the trial court's judgment.

/s/     Kevin Jewell
        Justice

Panel consists of Justices Jewell, Hassan, and Wilson.